2020 IL App (1st) 190565
No. 1-19-0565
Opinion Filed August 4, 2020

SECOND DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| *In re* COMMITMENT OF DERRICK MOODY | ) |
| | ) Appeal from the Circuit Court of |
| | ) Cook County, Illinois, |
| (The People of the State of Illinois, | ) County Department, |
| | ) Criminal Division. |
| Petitioner-Appellee, | ) |
| | )No. 11 CR 80020 |
| v. | ) |
| | )The Honorable |
| Derrick Moody, | )Peggy Chiampas, |
| | )Judge Presiding. |
| Respondent-Appellant). | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Pucinski and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1        This cause of action stems from proceedings initiated under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2018)), which identify individuals who are dangerous due to mental disorders that would predispose them to sexual violence and forces them into treatment for their own good and for the safety of society. After a bench trial, the respondent, Derrick Moody, was found to be a sexually violent person and ordered committed under the Act. On appeal, the respondent contends that the State failed to prove beyond a reasonable doubt that he was a sexually violent person where it did not establish (1) that he

currently suffers from a mental disorder that is either congenital or acquired that predisposes him to acts of sexual violence, and (2) that this mental disorder creates a substantial probability that he will commit more acts of sexual violence. The respondent further contends that the trial court denied him his right to a fair trial when it prevented him from cross-examining the State's two expert witnesses about the methodology they used in determining whether the respondent's mental disorder was congenital or acquired. For the reasons that follow, we affirm.

## I. BACKGROUND

The record before us reveals the following relevant facts and procedural history. On June 7, 1999, the respondent pleaded guilty to aggravated criminal sexual assault and was sentenced to 30 years' imprisonment in case No. 97 CR 4105. On October 13, 2011, shortly before the respondent was scheduled to be released from prison, the State filed a petition to involuntarily commit him pursuant to the Act. In support of the petition, the State relied on the report of its expert, Dr. John Arroyo, who diagnosed the respondent with a paraphillic disorder using the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (DSM-IV). In May 2013, the fifth edition of the DSM was issued (DSM-V). In April 2015, Dr. Arroyo amended his 2011 evaluation to reflect the updated nomenclature of the DSM-V, diagnosing the respondent with other specified paraphilic disorder, sexual interest in nonconsenting partners (OSPD nonconsent) and other specified personality disorder, with antisocial features (antisocial personality disorder). The State then amended their petition to reflect the updated diagnoses.

On October 29, 2018, the matter eventually proceeded to a bench trial. The State presented  testimony from two stipulated experts in the field of clinical forensic psychology, Dr. Arroyo and Dr. Steven Gaskell.

¶ 5      Dr. Arroyo first testified that he is a sex offender evaluator and clinical forensic psychologist employed by Wexford Health Sources, Inc., to conduct sexually violent persons evaluations pursuant to a contract with the Illinois Department of Corrections (IDOC). Since December 2009, Dr. Arroyo has completed 156 sexually violent persons evaluations, during which he has found less than half of the subjects (*i.e.* 76) to be sexually violent persons, requiring commitment.

¶ 6      According to Dr. Arroyo, an evaluation of a sexually violent person usually begins with an evaluator's receipt of the subject's master file, containing anything with the subject's name, including, police reports, criminal history, previous evaluations, disciplinary history, and medical records. After a review of these materials, the evaluator generally attempts to conduct an interview with the subject of the evaluation. Regardless of whether an interview takes place, the evaluator then performs a risk assessment and writes his report.

¶ 7      Dr. Arroyo acknowledged that, in 2011, he was asked to evaluate the respondent to determine whether he was a sexually violent person under the Act and that, after performing an evaluation, he determined that respondent was. Dr. Arroyo testified that in coming to this conclusion, he reviewed all the materials in the respondent's master file, including his criminal background, social history, and police, medical, disciplinary, and treatment records. Dr. Arroyo further averred that he attempted to interview the respondent on August 17, 2011, at the Logan Correctional Center, but that the respondent declined to participate, explaining that he had already spoken to a prior evaluator and that he believed that the evaluation was just another "way for the State to keep him locked up."

¶ 8      Dr. Arroyo testified that he completed his initial evaluation report on August 23, 2011. He updated that report on April 20, 2015, after the fifth edition of the DSM was published,

updating "the names of the diagnoses that had previously been given," based on the new nomenclature. Both reports were introduced into evidence at trial.

¶ 9        Dr. Arroyo testified that in concluding that the respondent was a sexually violent person, who requires commitment, he initially reviewed the respondent's criminal history and, in particular, his two prior felony convictions for sexually violent offenses. Dr. Arroyo testified that, in 1991, the respondent pleaded guilty to attempted aggravated criminal sexual assault and unlawful restraint in case number 91 CR 28304, for which he received a seven-year sentence. According to Dr. Arroyo, in that case, the respondent attacked a cleaning lady in the Sears Tower by grabbing the victim from behind, ripping her clothes off, and attempting to choke her with a towel. The victim kicked the respondent and freed herself, but he again grabbed her, forced her into a conference room, and choked her. The victim ultimately freed herself and fled to another floor for help, where a witness saw her running in only a bra and underwear. The respondent was found hiding under a desk with blood on his hands.

¶ 10        Dr. Arroyo testified that after serving his sentence in that case, in 1997, the respondent again pleaded guilty to aggravated criminal sexual assault, attempted murder, aggravated battery, and robbery, in case number 97 CR 4105, for which he was sentenced to 30 years' imprisonment. In that case, the respondent entered the Merchandise Mart looking for money. After searching several floors, the respondent saw the female victim through an office door and became aroused. He watched her "for a while" and began to rub his penis through his pants. When the victim exited the office to throw out the trash, the respondent repeatedly punched her in the face and choked her until she was unconscious. He then removed her pants and underwear, rubbed his penis on her vagina, and digitally penetrated her.

¶ 11    In addition to reviewing these felony convictions, Dr. Arroyo examined the respondent's arrest records from the 1980s and 1990s. According to these records, the respondent was regularly detained for criminal trespass to property, many of which involved voyeurism in women's restrooms. Dr. Arroyo recalled that one arrest stemmed from the respondent lying on the floor and looking at female victims under restroom stalls, while another resulted from the respondent exposing himself in a women's restroom.

¶ 12    Dr. Arroyo next testified that in concluding that the respondent was a sexually violent person, he also reviewed the respondent's treatment records. According to Dr. Arroyo, the respondent did not participate in any sex offender treatment while in IDOC but first began such treatment in 2011, when he was transferred to the Illinois Department of Human Services (IDHS) Treatment and Detention Facility (TDF). While in treatment at TDF, the respondent admitted that has victimized approximately 276 individuals of both genders (many while in IDOC). Twelve of these incidents involved hands-on contact, and the remainder involved voyeurism.

¶ 13    Based on the respondent's criminal history and treatment records, Dr. Arroyo opined that the respondent exhibited a pattern of escalating behavior, beginning with voyeurism and progressing to violent sexual assault. As Dr. Arroyo explained, the respondent had disclosed while he was in treatment that he initially "had some voyeuristic behaviors in his neighborhood," which were followed by "a separate section of voyeuristic behaviors that occurred downtown" and that the respondent found to be riskier and more dangerous. According to Dr. Arroyo, after this, the respondent additionally began "exposing himself" and then having "thoughts of pulling women into the bushes while he was in the bushes masturbating." The respondent subsequently

"attempted to assault a victim" and ultimately "brutally assaulted, physically assaulted and sexually assaulted a woman."

¶ 14        Dr. Arroyo further opined that the respondent's significant history of cocaine abuse corelated to his lack of impulse control. While Dr. Arroyo acknowledged that the respondent had a minimal disciplinary record in IDOC and only "a few" referrals to the behavioral committee at TDF, he opined that IDOC's disciplinary record did not reflect the respondent's own admissions of continued voyeurism while in prison and at most established that the respondent would do well in a "highly structured secure environment."

¶ 15        Based on his review of the respondent's file, and using the nomenclature of the DSM-V, Dr. Arroyo opined that, presently, the respondent suffers from three mental disorders: (1) OSPD nonconsent, (2) antisocial personality disorder, and (3) voyeuristic disorder. Dr. Arroyo explained that OSPD nonconsent presents as an intense and persistent sexual interest in nonconsenting adults, which ultimately results in personal distress or causes harm to either the individual suffering from the disorder or others. In addition, Dr. Arroyo explained that antisocial personality disorder presents as a person's pattern of disregard for, or violation of, the rights of others, beginning at the age of 15 and manifesting in continued behaviors that show lack of concern for others, demonstrate a lack of remorse, or that would be constitute grounds for arrest. Finally, according to Dr. Arroyo, voyeuristic disorder presents as a persistent and intense sexual arousal of an adult "by observing unsuspecting persons who are either nude, disrobing, or engaged in sexual activity as manifested by a person's urges, fantasies, or behaviors, and that the person has acted on those urges or the urges or fantasies caused distress or impairment."

¶ 16        Dr. Arroyo testified that he diagnosed the respondent with OSPD nonconsent because, as evidenced by his prior criminal history and his treatment disclosures, the respondent has engaged

in sexual activity with nonconsenting persons and has caused grave harm to them, as well as to himself (by being incarcerated). Dr. Arroyo explained that he diagnosed the respondent with voyeuristic disorder because the respondent has repeatedly engaged in voyeurism in the past and has disclosed fantasies of engaging in continued voyeuristic behavior over a period of several years. Finally, Dr. Arroyo testified that he diagnosed the respondent with antisocial personality disorder because of the respondent's history of (1) engaging in behaviors that were grounds for arrest, (2) showing lack of concern for others, and (3) attempting to minimize his behavior while in treatment at TDF.

¶ 17 In addition, Dr. Arroyo averred that all three of the respondent's conditions are lifelong and cannot be altered or resolved without treatment. He further explained that the disorders are "congenital or acquired" conditions that affect the respondent's emotional and volitional capacity and predispose him to acts of sexual violence. Dr. Arroyo concluded that all three of the respondent's diagnoses are qualifying mental disorders under the Act.

¶ 18 Dr. Arroyo next testified that in his opinion the respondent was dangerous and substantially likely to reoffend. In coming to this conclusion, Dr. Arroyo performed a risk assessment that consisted of the Static-99R actuarial instrument, which is the most widely used actuarial instrument in the scientific community to determine risk of reoffending. In addition, Dr. Arroyo considered numerous dynamic risk and protective factors. Dr. Arroyo averred that the respondent's score of 10 on the Static-99R (which has a range from -3 to 12) placed him the highest risk category, put him in the 99th percentile of individuals scored by that instrument, and made the respondent seven times more likely to reoffend than a typical sex offender. Moreover, according to Dr. Arroyo, the respondent's probability of reoffending was exacerbated by numerous dynamic risk factors, including his (1) intimacy deficiencies, (2) lack of concern for

others, (3) deviate sexual interests, (4) substance abuse (which correlates to his lack of impulse control), (5) lack of treatment while incarcerated in IDOC, and (6) antisocial personality disorder.

¶ 19    Dr. Arroyo acknowledged that in coming to this conclusion, he considered several protective factors, such as the respondent's age, physical disability, and the respondent's successful completion of phase 2 of his treatment at TDF but found that none of these decreased his risk of reoffending. Specifically, Dr. Arroyo explained that even though the respondent was 57 years old, the respondent's age had already been considered as a factor in the Static-99R analysis and did not warrant any further reduction of risk. Moreover, the respondent had no medical condition that would prevent him from reoffending. Similarly, while the respondent began treatment in TDF and completed phase 2 (the disclosure portion), Dr. Arroyo opined that the treatment was not a protective factor because the respondent had only just begun phase 3 (which is the point at which the respondent begins developing a relapse prevention plan and begins to examine his offense cycle).

¶ 20    On cross-examination, Dr. Arroyo acknowledged that the fact sheet for case number 97 CR 4105 noted that the respondent did not ejaculate and could not maintain an erection during his offense. He also admitted that the respondent has never received a ticket for sexual misconduct in IDOC or while at the TDF, that the respondent's IDOC tickets never resulted in him being placed in segregation, and that the respondent was on the highest behavioral status at the TDF.

¶ 21    On cross-examination, Dr. Arroyo further acknowledged that under the SVP Act "congenital" refers to a condition that one is born with, while "acquired" refers to a condition that is acquired later in life. Dr. Arroyo admitted, however, that he could not specify whether the

respondent's mental disorders were congenital rather than acquired. The respondent's counsel asked if Dr. Arroyo had ordered any genetic testing to determine whether the respondent's disorders were congenital. The State objected, arguing that the question was irrelevant because the Act does not require an expert to specify whether a condition is congenital or acquired, and the trial court sustained the objection.

¶ 22       On cross-examination, Dr. Arroyo also admitted that the DSM-V itself acknowledges an imperfect fit between clinical diagnoses and questions of law and warns that there is a risk that the diagnostic information could be misused or misunderstood when it is used for forensic purposes. He also admitted that a DSM-V neither implies a specific level of impairment nor provides information about what caused the diagnosis. Finally, Dr. Arroyo admitted that a DSM-V diagnosis does not offer any information about an individual's control over his behavior and that not all repeat sex offenders suffer from OSPD.

¶ 23       The State's second witness, Dr. Steven Gaskell, next testified that he is a forensic psychologist who contracts with IDHS to provide risk assessment evaluations in sexually violent person cases.

¶ 24       Dr. Gaskell testified that, at the request of IDHS, he performed an evaluation of the respondent and determined that the respondent was a sexually violent person requiring commitment. Dr. Gaskell explained that he completed his initial evaluation in February 2012, but amended his report in 2015 to update the nomenclature based on the new edition of the DSM-V and to reevaluate his opinion based on the additional records in the respondent's casefile from the time of his original report. Both reports were introduced into evidence at trial.

¶ 25       Like Dr. Arroyo, Dr. Gaskell testified that, in performing his evaluation, he reviewed the respondent's entire file (including, *inter alia*, his medical, criminal, IDOC, and TDF records). In

addition, Dr. Gaskell testified that he conducted a two-hour interview with the respondent on January 31, 2012, at TDF.

¶ 26    During this interview, Dr. Gaskell asked the respondent about his two prior felony sex offense convictions. According to Dr. Gaskell, the respondent tried to minimize both offenses. For the 1991 sexual assault in the Sears Tower, the respondent denied any sexual nature to the attack and told Dr. Gaskell that he took the victim by surprise and knocked her down, but that she tried running away, so he grabbed her smock and it came off, which was why she was found running half-clad in the building. With respect to the 1997 offense in the Merchandise Mart, the respondent told Dr. Gaskell, that he had been "using cocaine a lot" and that he saw the woman and became aroused. The respondent denied masturbating and instead said he "was fondling himself," which Dr. Gaskell stated, "seemed to be the same thing." The respondent told Dr. Gaskell that after "fondling himself," he left but was thinking about the woman's purse and "that's what brought him back to the scene." The respondent said he then "had the altercation where [he] hit [the victim], knocked her down, [and] fondled her," but denied that he inserted his finger into her vagina.

¶ 27    Dr. Gaskell further testified that during his interview with the respondent, he asked the respondent about his substance abuse and any treatment that the respondent received in IDOC. The respondent told Dr. Gaskell that for about a year and a half he participated in a substance abuse program at IDOC but that he did not complete it. With respect to sex offender counseling, the respondent told Dr. Gaskell that he refused any such treatment because he did not want that "stigma" attached to him in IDOC.

¶ 28    Dr. Gaskell next testified that in coming to his conclusion that the respondent was a sexually violent person, he considered the entirety of the respondent's criminal history. Dr.

10

Gaskell explained that prior to the commission of the two felony sex offenses, the respondent's criminal history reflected 8 nonsexual convictions (for criminal trespass to land, theft, and battery) and at least 15 arrests that did not result in convictions. Like Dr. Arroyo, Dr. Gaskell recalled that several of these minor convictions and arrests involved voyeuristic behavior. Specifically, Dr. Gaskell averred that in 1985 the respondent was convicted of criminal trespass to land and sentenced to a year of probation, for crawling under a stall in a downtown women's bathroom after having previously exposed himself to another woman in the same building. In 1987, he was again arrested for criminal trespass for entering a women's restroom, and in 1990, the same behavior resulted in a conviction for criminal trespass and a sentence of six months in jail. Like Dr. Arroyo, Dr. Gaskell opined that the respondent's criminal history reflected a pattern of progressively more violent sexual behavior.

¶ 29    While Dr. Gaskell agreed that the respondent's disciplinary records from IDOC, and subsequently TDF, were "unremarkable," he found one incident wherein the respondent wrote a poem to a nurse relevant as reflective of the respondent's continued inability to appreciate boundaries.

¶ 30    Dr. Arroyo further found relevant that the respondent did not begin any sex offense treatment until 201, when he transferred to TDF. According to Dr. Arroyo, even then the respondent was initially reluctant to participate in therapy. According to the respondent's treatment records, the respondent began disclosure treatment (phase 2) in 2014, where he finally "started taking some more responsibility for his actions," and post-disclosure treatment (phase 3) in 2018.

¶ 31     Based on the aforementioned, just like Dr. Arroyo, Dr. Gaskell diagnosed the respondent with OSPD nonconsent, antisocial personality disorder, and voyeuristic disorder. In addition, Dr. Gaskell diagnosed the respondent with stimulant use disorder (specifically cocaine abuse).

¶ 32     Dr. Gaskell explained that he diagnosed the respondent with OSPD nonconsent because the respondent had recurrent, intense sexually arousing fantasies, urges, or behaviors about nonconsensual sex acts and had engaged in nonconsenting acts on multiple occasions, which caused harm to others, and only some of which resulted in convictions. Most importantly, in making his diagnosis, Dr. Gaskell found relevant that the respondent admitted in treatment that he used force on seven victims, and that "his most sexually exciting fantasy would be to sexually assault a woman." The respondent also reported in treatment that 10 of his victims had been children.

¶ 33     Dr. Gaskell further explained that he diagnosed the respondent with voyeuristic disorder because the respondent demonstrated recurrent, intense sexually arousing fantasies, urges, or behaviors over a six-month period involving looking at someone who was disrobing or naked and had engaged in voyeuristic behavior on multiple occasions. Dr. Gaskell testified that the respondent's criminal history from 1985, 1990, and even 1997 showed a pattern of such voyeurism. In addition, Dr. Gaskell explained that in treatment, the respondent has reported over 250 victims of his voyeurism, including numerous victims while in IDOC.

¶ 34     Dr. Gaskell also explained that he diagnosed the respondent with antisocial personality disorder with narcissistic traits because the respondent had a history of behaviors that were grounds for arrests and because he exhibited a grandiose sense of self-importance, a lack of empathy, and a history of exploiting others for personal gain.

¶ 35        According to Dr. Gaskell, all of the respondent's medical disorders were "congenital or acquired," chronic, lifelong conditions that could only be managed with treatment.

¶ 36        Dr. Gaskell further testified that it was his opinion that the respondent was substantially likely to commit future acts of sexual violence. In reaching this conclusion, Dr. Gaskell performed a risk assessment using the Static-99R and the Static-2002R actuarial instruments. In addition, he considered various applicable dynamic risk and protective factors. According to Dr. Gaskell, the respondent's score of 9 on the Static-99R, placed him in the highest risk category and made him over seven times more likely than the average sex offender to reoffend. Dr. Gaskell noted that only 0.02 percent of sex offenders score higher than the respondent. Similarly, the respondent's score of 7 on the Static-2002R placed him in the highest risk category and meant that he was 3.62 times more likely to reoffend than the average sex offender. In addition, Dr. Gaskell identified numerous dynamic risk factors that would increase the respondent's likelihood of reoffending, including, *inter alia*, (1) his deviant sexual interest in nonconsensual partners, voyeurism, frotteurism, and children; (2) his antisocial personality disorder; (3) his employment instability; (4) his hostility, general self-regulation problems, impulsiveness and recklessness; (5) his substance abuse and intoxication during the commission of prior offenses; and (6) his noncompliance with supervision. Dr. Gaskell testified that he found no protective factors that reduced the respondent's risk of reoffending.

¶ 37        On cross-examination, Dr. Gaskell was asked whether the respondent's disorders were congenital. The State objected, and the trial court sustained the objection. Dr. Gaskell subsequently testified that the respondent's disorders were "congenital or acquired." When asked by the respondent's counsel to explain how he knew this was the case, Dr. Gaskell responded,

"What is the third option? If a person's not born with it or they acquire it, what would be the third option that it would not be one of those things?"

¶ 38    Following Dr. Gaskell's testimony, the circuit court allowed certified copies of the respondent's convictions in case numbers 97 CR 4106 and 91 CR 28304 to be entered into evidence.

¶ 39    After the State rested, the parties stipulated that if called to testify, TDF clinical therapist Rebecca Houzenga would state that she was the respondent's primary therapist at TDF between 2015 and 2018. She would further state that during the disclosure phase of his therapy at TDF, the respondent told her that he once "voyeur-ed" a young girl under a bathroom stall while attempting to look at her mother. The respondent estimated that the girl was 10 years old "in order to take the greatest amount of responsibility for his actions," and he did not disclose any additional minor victims. Houzenga would state that when on August 4, 2017, she met with a polygraph examiner, she never told him that the respondent stated that he had victimized 10 minors. When Houzenga later reviewed the results of the respondent's polygraph, she noticed a discrepancy between the respondent's disclosure in therapy and a statement attributed to him during the polygraph that "as an adult" he "victimized 10 minors." Houzenga discussed the polygraph report with the respondent and he denied disclosing to the polygraph examiner that he had victimized 10 children. Houzenga later reviewed the results of the respondent's subsequent June 19, 2018, polygraph examination. During that polygraph, the respondent denied having "engaged in any physical sexual contact with any minor," and no deception was indicated. Based on this, Houzenga concluded that the statement in the respondent's August 4, 2017, polygraph was an error on the part of either the respondent or the examiner.

¶ 40    Following closing arguments, the trial court found that the respondent was a sexually violent person under the Act. In doing so, the court specifically stated that it did not consider Dr. Gaskell's testimony that the respondent had admitted to sexually abusing children because the stipulated testimony of Houzenga established that these statements were made in error. On January 22, 2019, the circuit court denied the respondent's motion for a new trial, and the parties stipulated that the respondent had not made sufficient progress in treatment to be conditionally released. The respondent now appeals.

¶ 41                            II. ANALYSIS

¶ 42                       A. Sufficiency of Evidence

¶ 43    On appeal, the respondent first contends that the evidence presented at trial was insufficient to establish that he was a sexually violent person beyond a reasonable doubt. When reviewing sufficiency of evidence claims, such as the one raised here by the respondent, we consider whether "viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. Because as the trier of fact, the trial court is responsible for resolving conflicts in the evidence and determining the credibility of the witnesses and the weight to be given particular testimony, on appeal, we may not substitute our judgment for that of the trier of fact and will not reverse its determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 44    To establish that the respondent was a sexually violent person under the Act, the State had to prove beyond a reasonable doubt that (1) the respondent was convicted of a sexually violent offense, (2) the respondent has a mental disorder, and (3) the mental disorder creates a

"substantial probability" that he or she will engage in acts of sexual violence. 725 ILCS 207/15(b)(1)(A), (b)(4), (b)(5) (West 2018).

¶ 45     In the present case, the respondent does not, nor could he, dispute the State's proof of the first element, *i.e.*, that he was convicted of at least one sexually violent offense. Rather, the respondent contends that the State failed to prove that he has a mental disorder and that this disorder makes it substantially more likely that he will engage in acts of sexual violence. We will address each of the respondent's contentions in turn.

¶ 46                              1. Existence of Mental Disorder

¶ 47     The respondent first argues that the State failed to prove beyond a reasonable doubt that he suffers from a mental disorder as defined under the Act. Referencing various isolated portions of Dr. Gaskell and Dr. Arroyo's testimonies, the respondent argues that in concluding that the respondent has a mental disorder, the two experts gave only "canned opinions" that parrot the language of the Act, without offering any bases for their ultimate conclusions. We disagree.

¶ 48     The Act defines a " '[m]ental disorder' " as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b). While our supreme court "has not given us guidance as to what sort of factual predicate suffices to establish the presence of a mental disorder," in determining whether the State has met its burden, our appellate courts have routinely relied on expert testimony, and deferred to the factfinder's determinations regarding an expert's credibility. *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36; see also *Fields*, 2014 IL 115542, ¶ 27; *White*, 2016 IL App (1st) 151187, ¶¶ 58-62.

¶ 49     In the present case, the State presented unrebutted testimony from two experts that the respondent has a mental disorder as defined by the Act. Both Dr. Gaskell and Dr. Arroyo

diagnosed the respondent with OSPD nonconsent, antisocial personality disorder, and voyeuristic disorder. Both experts provided clinical definitions of the three mental disorders and explained why they diagnosed the respondent with these disorders. Both explained that their conclusions were based upon the respondent's records and his admissions while in treatment and outlined how the facts of the respondent's life and the circumstances of his repeated sexual offenses supported their diagnoses. Both Dr. Arroyo and Dr. Gaskell testified that the respondent admitted to having over 250 victims of both genders, including 12 "hands on victims." Both evaluators also testified that the respondent's offenses escalated from peeping and exposure in women's restrooms to an attempted sexual assault and, ultimately, to a brutal attack and completed sexual assault. Both testified that despite repeated arrests and incarceration, the respondent continued his behavior, unable to control his urges and harming both himself and others, while minimizing his conduct. Dr. Gaskell also testified that the respondent admitted in treatment that "his most enticing sexual fantasy would be to sexually assault a woman." Under this record, taking the evidence in the light most favorable to the State, we find that a rational factfinder could find beyond a reasonable doubt that the respondent suffers from "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes" him "to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2018).

¶ 50       The respondent's argument to the contrary is nothing more than a request that this court reweigh the experts' testimony and credibility, a task we, as the reviewing court, simply "cannot undertake." *Gavin*, 2019 IL App (1st) 180881, ¶ 39.

¶ 51       The respondent's reliance on *People v. Murray*, 2019 IL 123289, in this vein, is misplaced. In that case, the defendant, a member of the Latin Kings, was convicted of possession of a firearm by a street gang member, which required proof that he was a member of a group that

engages in a pattern of criminal activity. *Id.* ¶ 22. The State presented testimony from a police officer, who testified that he was familiar with the Latin Kings and summarily opined that the Latin Kings were a street gang under the terms of the relevant statute. *Id.* ¶ 26. The officer did not testify about any criminal activity committed by the gang. *Id.* ¶ 27.

¶ 52      In reversing the defendant's conviction on sufficiency of evidence grounds, our supreme court held that the State had failed to provide sufficient evidence that the Latin Kings engaged in a pattern of criminal activity. *Id.* ¶ 53.

¶ 53      Contrary to *Murray*, which involved an expert who testified as to the types of information underlying his opinion without testifying as to the connection between that information and his summary opinion, both Dr. Arroyo and Dr. Gaskell extensively testified that the pattern of respondent's behavior documented in the records they reviewed led directly to their diagnoses. The two experts did not render summary opinions on a requisite element based merely on unexplained personal familiarity. Accordingly, *Murray* is inapposite.

¶ 54      The respondent alternatively argues that the evidence was insufficient to prove that he suffers from a mental disorder because, contrary to the plain language of the statute, the State failed to specify whether he suffered from a condition that was either "congenital or acquired" and then prove to which of these two categories his mental disorder belongs. For the reasons that follow, we disagree.

¶ 55      At the outset, we note that to the extent that the respondent is asking us to interpret the Act in ruling upon this issue, that question is one of law, which is subject to *de novo* review. *White*, 2016 IL App (1st) 151187, ¶ 44; see also *In re Detention of Hardin*, 238 Ill. 2d 33, 40 (2010); *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 36. The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *White*, 2016

IL App (1st) 151187, ¶ 45; see also *People v. Dabbs*, 239 Ill. 2d 277, 287 (2010). The most reliable indicator of that intent is the plain and ordinary meaning of the statutory language itself. *White*, 2016 IL App (1st) 151187, ¶ 45; *Dabbs*, 239 Ill. 2d at 287. In determining the plain meaning of statutory terms, a court should consider the statute in its entirety and keep in mind the subject the statute addresses and the apparent intent of the legislature in enacting that statute. *White*, 2016 IL App (1st) 151187, ¶ 45; *Dabbs*, 239 Ill. 2d at 287. If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory construction. *White*, 2016 IL App (1st) 151187, ¶ 45; *Dabbs*, 239 Ill. 2d at 287. A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. *White*, 2016 IL App (1st) 151187, ¶ 45; see also *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007).

¶ 56     Contrary to the respondent's contention, the Act does not require the State to prove with specificity whether the respondent's mental disorder is "congenital or acquired." As already noted above, the Act defines a mental disorder as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2018). Because the statute does not define either "congenital" or "acquired," the terms must be given their plain and ordinary meaning. *People v. McChriston*, 2014 IL 115310, ¶ 15 ("When the statute contains undefined terms, it is entirely appropriate to employ a dictionary to ascertain the plain and ordinary meaning of those terms." (Internal quotation marks omitted.)). The Merriam-Webster dictionary defines "congenital" as "existing at or dating from birth," "constituting an essential characteristic: INHERENT," "acquired during development in the uterus and not through heredity" and "being such by

19

nature." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/congenital (last visited July 23, 2020) [https://perma.cc/8SMM-V65P]. The dictionary defines "acquired" in the context of a disease or a medical condition as "developed after birth: not congenital or hereditary." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/acquired (last visited July 23, 2020) [https://perma.cc/6D3Z-K3SA]. As is evident from their plain and ordinary meaning, the two terms are antonyms.

¶ 57    Reading the terms as such, the most natural reading of the statute is that a mental disorder is any condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence, whether congenital or not. Contrary to the respondent's position, this reading does not render the phrase "congenital or acquired" meaningless. Rather, it acknowledges the intent of the legislature to focus commitment proceedings on persons who have a mental condition that predisposes them towards sexual violence, regardless of the underlying source of that condition. As such, contrary to the respondent's position, the legislature did not intend to require the State to prove the additional element of "congenital or acquired." Rather, it intended to provide the State with a means of protecting society from individuals, whose conditions affect their emotional or volitional capacity in a way that predisposes them to engage in acts of sexual violence, regardless of the precise origin of those diagnosed conditions. See *In re Detention of Lieberman*, 201 Ill. 2d 300, 319 (2002) (purpose of Act is "to keep our communities safe from predatory sex offenders who pose an ongoing threat to our citizens").

¶ 58    In making his argument to the contrary, the respondent cites to no case law that applies his interpretation of the Act. Nor could he, since in the more than 20 years since the passage of

the Act, our courts have entertained sufficiency of evidence challenges without any discussion of whether a respondent's mental disorders were specifically congenital or acquired. See, *e.g.*, *Fields*, 2014 IL 115542, ¶¶ 21-27; *Gavin*, 2019 IL App (1st) 180881, ¶¶ 32-41. Since we see no difference in the threat posed by an individual who is diagnosed with a congenital rather than an acquired mental disorder, or vice versa, and the respondent cannot point to any, we see no reason to depart from our prior precedent, and reject the respondent's invitation to depart from the plain language of the statute.

¶ 59    Therefore, since both experts here testified that the respondent has a "congenital or acquired" condition that affects his emotional or volitional capacity in a way that predisposes him to acts of sexual violence, we find that the evidence was sufficient to establish the second element of a claim under the Act.

¶ 60                                2. Substantial Risk of Reoffending

¶ 61    The respondent next challenges the sufficiency of the State's evidence to prove that his mental disorder created a substantial probability that he would reoffend. See 725 ILCS 207/15(b)(5) (West 2018) (the third element requires the State to prove that "[t]he person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence"). The respondent contends that the State's experts relied on speculation and did not sufficiently link his risk of reoffending to any mental disorder and that even if the State adequately proved a causal link between his mental disorder and risk to reoffend, it failed to prove that the risk rose to the level of substantially probable. We disagree.

¶ 62    At the outset, we note that our courts have repeatedly held that as used in the Act, " ' " 'substantially probable' " ' " means " ' " 'much more likely than not' " ' " that the respondent will commit acts of sexual violence as a result of his mental disorder. *In re*

21

*Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 43 (quoting *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 24, quoting *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 37, and *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000)).

¶ 63      In the present case, both Dr. Arroyo and Dr. Gaskell testified that after performing an actuarial risk assessment and considering numerous dynamic risk and protective factors, they concluded that, because of his mental disorders, the respondent was substantially probable to engage in future acts of sexual violence. Both experts scored the respondent in the highest risk category of the Static-99R actuarial test, concluding that statistically he was more than seven times as likely to reoffend than an average sex offender. Dr. Gaskell additionally utilized the Static-2002R actuarial instrument, according to which the respondent's score again placed him in the highest risk category, predicting that he was 3.62 times more likely to reoffend than the average sex offender. Both experts further testified that the respondent's probability to reoffend was exacerbated by the presence of numerous empirical risk factors, including the respondent's (1) lack of concern for others, (2) deviant sexual interest, (3) lack of treatment while in IDOC, (4) antisocial personality disorder, (5) hostility, (6) impulsiveness, (7) recklessness, (8) employment instability, and (9) substance abuse. In addition, neither expert found any protective factors that mitigated the respondent's risk to reoffend. Taking this evidence in the light most favorable to the State, we are compelled to conclude that a rational trier of fact could find beyond a reasonable doubt that respondent was substantially probable to commit future acts of sexual violence under the Act.

¶ 64      The respondent's argument that the State failed to prove that his disorders caused his substantial probability to reoffend is meritless. In *Gavin*, 2019 IL App (1st) 180881, ¶¶ 45, 50, this court rejected an identical argument, noting that the experts in that case had demonstrated an

understanding of the third element required to commit an individual as a sexually violent person under the Act. Specifically, in *Gavin*, the court found that one of the experts had testified that to prove someone is a sexually violent person, the State had "to show that due to that mental disorder, it is substantially probable that they will engage in future acts of sexual violence." (Emphasis and internal quotation marks omitted.) *Id.* ¶ 50. The court in *Gavin* concluded that when viewed in context, the experts' testimony sufficiently linked the respondent's likelihood to reoffend to his diagnoses. *Id.* Here, both Dr. Arroyo and Dr. Gaskell testified that they were aware of the elements of the Act and opined that under the Act the respondent was a sexually violent person. Moreover, Dr. Arroyo was specifically asked if the respondent's mental disorders made him substantially probable to commit future acts of sexual violence, and he answered in the affirmative. Accordingly, the expert's testimony clearly linked the respondent's substantial probability of reoffending to his mental disorders. See *id.* ¶¶ 45, 50 (holding that the evidence was sufficient to support a finding that the offender's mental disorder created a substantial probability that he would reoffend, as required for offender to be committed as a sexually violent person, where two psychological experts who testified in State's case framed their conclusions about the offender's likelihood to reoffend as results of the offender's paraphilic disorder and antisocial personality disorder).

¶ 65                                    B. Cross-Examination

¶ 66            On appeal, the respondent next contends that he was denied a fair trial when the trial court prevented him from cross-examining the State's experts regarding the methodology they used in determining whether his mental disorders were congenital or acquired. Specifically, the respondent complains that on cross-examination, Dr. Arroyo acknowledged that he could not state whether the respondent's conditions were congenital or acquired. Defense counsel then

followed up by asking whether Dr. Arroyo had ordered any genetic or other testing to determine to which category the disorders belonged, but the trial court sustained the State's objection to that question. The respondent complains that the trial court sustained a similar objection to defense counsel's questioning of Dr. Gaskell regarding how he knew whether the condition was genetic or acquired. According to the respondent, the trial court's rulings prevented him from exploring the weaknesses in the experts' opinions that he had a mental disorder. We disagree.

¶ 67　　　　It is well-established that the scope-of cross examination is an evidentiary ruling that is within the sound discretion of the trial court. *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 605 (2007); see also *People v. Caffey*, 205 Ill. 2d 52, 89 (2001); *People v. Arze*, 2016 IL App (1st) 131959, ¶ 113. Accordingly, such a ruling will not be reversed unless the trial court has abused its discretion, resulting in manifest prejudice to the respondent. *Lieberman*, 379 Ill. App. 3d at 605; *Caffey*, 205 Ill. 2d at 89; *Arze*, 2016 IL App (1st) 131959, ¶ 113.

¶ 68　　　　Evidence is admissible only if it is relevant. Ill. R. Evid. 402 (eff. Jan.1, 2011). Relevant evidence is evidence that has a tendency to make the existence of any material fact more or less probable than it would be without the evidence. *People v. Green*, 339 Ill. App. 3d 443, 453-54 (2003).

¶ 69　　　　As already explained above, under the plain language of the Act, the State was not required to prove whether the respondent's mental condition was specifically congenital or acquired. Rather, it was required to prove only that the respondent suffered from a mental disorder, regardless of its origin. Since the specific time of the respondent's acquisition of his mental disorder was not a material fact, it was irrelevant, and the trial court properly barred defense counsel from this line of inquiry

¶ 70       Moreover, even if the trial court's evidentiary ruling was erroneous, reversal is not mandated because the respondent cannot establish that he was manifestly prejudiced. The record reveals that the trial court was aware that neither expert could specify whether the disorder was genetic or acquired after birth. Specifically, Dr. Arroyo admitted that he was unable to determine when the respondent acquired the disorder. Dr. Gaskell similarly explained that he concluded that the respondent's condition was either congenital or acquired because logically it had to be one or the other, since there was no third option. Despite sustaining the State's objection to the cross-examination, the trial court was aware of the testimony that would have been offered by the two experts on this issue. Therefore, the respondent suffered no manifest prejudice. See *Arze*, 2016 IL App (1st) 131959, ¶ 113.

¶ 71                                    III. CONCLUSION

¶ 72       Accordingly, for all the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 73       Affirmed.

**No. 1-19-0565**

| | |
|---|---|
| **Cite as:** | *In re Commitment of Moody* , 2020 IL App (1st) 190565 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 11-CR-80020; the Hon. Peggy Chiampas, Judge, presiding. |
| **Attorneys for Appellant:** | Michael R. Johnson, Kate E. Levine, and Ian C. Barnes, of Johnson & Levine LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Nicholas Moeller, Assistant Attorneys General, of counsel), for the People. |