2024 IL App (1st) 231114-U

No. 1-23-1114

Order filed July 8, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* COMMITMENT OF MARIO DIAZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20 CR 80000 |
| | ) | |
| Mario Diaz, | ) | The Honorable |
| | ) | James B. Novy, |
| Respondent-Appellant.) | ) | Judge, presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court did not abuse its discretion in limiting defense counsel's cross-examination of the State's expert witnesses, and respondent was not prejudiced by that limitation.

¶ 2    Following a bench trial under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2020)), respondent Mario Diaz was found to be a sexually violent person

(SVP) and committed to the custody of the Department of Human Services (Department). On appeal, respondent contends that the trial court erred in limiting cross-examination on psychological testing of the percentages to reoffend when the State's witnesses considered uncharged offenses over respondent's age, disability, sobriety, and diseases. We affirm.

¶ 3    In April 2020, the State filed a petition under the Act to declare respondent an SVP and commit him to the Department's custody for "control, care, and treatment until" he was no longer an SVP. The State alleged respondent (1) was convicted of predatory criminal sexual assault and sentenced to 15 years' imprisonment; (2) was diagnosed by psychologist Dr. Mark Kuzia with "Pedophilic Disorder, Sexually Attracted to Females, Non-Exclusive Type" and "Alcohol Use Disorder, In a Controlled Environment"; (3) suffered one or more mental disorders affecting his emotional or volitional capacity and predisposing him to commit acts of sexual violence; and (4) was dangerous to others because his mental disorders created a substantial probability he would engage in acts of sexual violence.

¶ 4    Also in April 2020, the circuit court ordered that respondent be transferred from prison to a Department facility. In May 2020, the circuit court found probable cause to believe that respondent was an SVP and ordered that he be detained in a Department facility and that the Department evaluate whether he was an SVP.

¶ 5    At the February 2023 bench trial, the parties stipulated that respondent was convicted of predatory criminal sexual assault in Cook County case 07 CR 14848.

¶ 6    Dr. Kuzia testified that, as a licensed clinical psychologist, he evaluated 76 persons under the Act and opined that 30 were SVPs and 46 were not. For evaluations, he would receive a file consisting of the subject's police and court records regarding prior sex offenses, medical records,

and prison records. The records were "of the type that are reasonably relied upon by experts" such as Dr. Kuzia. He would then interview the subject with his or her consent. Taking all the information from the file and interview, Dr. Kuzia would first determine whether the subject had a mental health diagnosis and, if so, perform a risk assessment, then form an opinion as to whether the subject was an SVP.

¶ 7    Dr. Kuzia conducted a clinical evaluation of respondent to determine whether he should be committed under the Act. He followed the aforesaid steps, including reviewing respondent's file and interviewing him with his consent. After the interview, Dr. Kuzia formed an opinion to a reasonable degree of psychological certainty that respondent was an SVP under the Act, issuing a report to that effect in March 2020. Dr. Kuzia later re-evaluated respondent, reviewing his Department records since April 2020, and issued an addendum to his report in February 2023. Dr. Kuzia's opinion that respondent was an SVP was unchanged in his addendum and was still unchanged at trial.

¶ 8    In forming his opinion, Dr. Kuzia reviewed the police report and court records in case 07 CR 14848, which showed that the victim of the predatory criminal sexual assault was respondent's three-year-old granddaughter. Respondent penetrated her vagina with his penis and ejaculated on her. He threatened an 11-year-old eyewitness and tried to stop the victim's mother from reporting the incident. When Dr. Kuzia asked him about that case, respondent "denied any wrongdoing in the matter" and "deflected by placing the blame on the family."

¶ 9    In another Cook County criminal case, 03 CR 12178, respondent was charged with child abduction and aggravated battery and the police report indicated that he victimized two eight-year-old girls in a park, grabbing one by the wrist and propositioning the other to watch him urinate.

He was convicted in that case, receiving six months in jail and two years of probation. When Dr. Kuzia asked him about this matter, respondent again denied any wrongdoing.

¶ 10    In June 1991, respondent was arrested for criminal sexual abuse on allegations he inserted his finger into the vagina of a five-year-old girl and a physician noted the resultant redness and swelling, but respondent was not prosecuted. When Dr. Kuzia asked respondent about the 1991 incident during his interview, respondent "didn't recall it."

¶ 11    In October 1977, respondent was arrested for indecent liberties with a child but was not prosecuted. The police report stated he was seen on a school rooftop "with a half-dressed [five-year-old] girl on top of him." When Dr. Kuzia asked respondent about this matter, he said the girl's mother asked him to watch her as she enrolled her in school.

¶ 12    Dr. Kuzia considered incidents that did not result in a conviction in forming his opinion because most people are not arrested for sex crimes. He explained, "we're not just looking at crimes to determine whether they meet a pattern that would substantiate a diagnosis" but "any information available that might help me to understand the person." Dr. Kuzia also considered respondent's prison and Department records, which showed only minor disciplinary issues except for a 2004 violation of probation related to a battery conviction.

¶ 13    Dr. Kuzia diagnosed respondent with "Pedophilic Disorder, Sexually Attracted to Females, Non-Exclusive Type" and "Alcohol Use Disorder, in a Controlled Environment." Dr. Kuzia explained these are mental disorders under the Act because they affect volitional or emotional capacity and predispose one to acts of sexual violence. The pedophilic disorder diagnosis was based on respondent being involved in multiple incidents of a sexual nature with prepubescent girls. Regarding the alcohol use disorder diagnosis, Dr. Kuzia explained that respondent

"technically *** hadn't drank" but "was in a controlled environment" with few if any opportunities to drink alcohol, so Dr. Kuzia could not find respondent's disorder to be in remission without several months when he had access to alcohol. While the alcohol use disorder would not "by itself" predispose respondent to sexual violence, alcohol as "a disinhibitor" would "greatly contribute[] to his acting" on his pedophilic disorder.

¶ 14    Having diagnosed respondent with mental disorders under the Act, Dr. Kuzia conducted a risk assessment to determine whether it was substantially probable, or "[m]uch more likely than not," respondent would commit further acts of sexual violence. Dr. Kuzia used "actuarial measures, which are empirical tools used to assist in the prediction of an outcome," specifically here the Static-99R and Static-2002R, to provide "a baseline, or a starting point." He also considered dynamic factors that can change over time and risk-lowering protective factors.

¶ 15    Respondent scored two on the Static-99R and four on the Static-2002R, both indicating an "average range of risk." However, Dr. Kuzia believed these scores underrepresented respondent's risk. The actuarial instruments did not provide "the complete accurate risk assessment" for respondent, and Dr. Kuzia also considered dynamic factors "based on research and studies that indicate that they have predictability." He identified four dynamic factors for respondent: (1) deviant sexual interest, here in children, with abuse of a three-year-old suggesting escalation, (2) offensive supporting attitudes, or beliefs justifying or excusing sexual offenses, including respondent stating children could begin having sex with adults at 13 years old and that children sexually teased him by rubbing against him, (3) resistance to rules and supervision, including respondent stating he would not go to Alcoholics Anonymous, even if ordered, and saw no benefit in sex offender treatment, and (4) lifestyle impulsivity, as indicated by respondent's alcoholism.

¶ 16    Dr. Kuzia also considered whether respondent had any protective factors. While respondent being 65 years old deducted points from his actuarial scores, Dr. Kuzia did not consider his age an additional protective factor, noting that he committed his most recent offense when he was 50. As to medical condition as a potential protective factor, respondent had Parkinson's Disease, a hip replacement, a seizure disorder, diabetes and asthma, but Dr. Kuzia did not consider his health a protective factor because his victims were young girls, including a three-year-old, and thus vulnerable even to a man in ill health. Sex offender treatment was not a protective factor for respondent because he chose not to engage in treatment while in the Department's custody since April 2020. Respondent acknowledged his alcoholism but, despite having been warned of the effect of alcohol on his pedophilic disorder, took no responsibility and made "no attempt to remediate himself." Dr. Kuzia concluded from his risk assessment that respondent was "substantially probable to recidivate" and, with his conviction and diagnoses, was an SVP.

¶ 17    On cross-examination, Dr. Kuzia testified that respondent's scores on the Static-99R and Static-2002R had "associated recidivism rates," but Dr. Kuzia was taught that "the absolute risk numbers *** were the least reliable numbers to be used when reporting data associated with the Static-99R." He acknowledged that respondent's Static-99R score was associated with a five-year recidivism rate of 4-5.2 % "for the low-risk group" and a ten-year recidivism rate of 5.8-8.9 % "for a high-risk group." However, Dr. Kuzia explained that "there are limitations to those numbers," including that they are based on persons *convicted* for reoffending, which underestimates reoffending "especially against a population with young children." He explained that the difference between reoffending and being convicted of reoffending is what makes the percentages "the least reliable numbers" according to the authors of the Static-99R. Dr. Kuzia gave

as an example respondent's abuse of a three-year-old, which likely would not have resulted in conviction without the 11-year-old eyewitness.

¶ 18    When Dr. Kuzia was asked if the aforesaid percentages were "less than one-fifth of *** what more likely than not would be," the State objected that substantial probability cannot be quantified as a percentage under Illinois case law. Respondent argued that he was arguing whether recidivism was "probable at all" here. The court found that a possibly appropriate closing argument but not a line of questioning for Dr. Kuzia and sustained the objection.

¶ 19    Dr. Kuzia acknowledged that respondent was not diagnosed with pedophilic disorder when he was diagnosed in 2015 with depression with psychotic features and in 2019 with unspecified anxiety disorder. When asked if he used the first dynamic factor in the risk assessment, deviant sexual interest, in diagnosing respondent with mental disorders, Dr. Kuzia explained that it was a dynamic factor that could change because a person could have pedophilia but with treatment could effectively manage it. Similarly, while respondent was diagnosed with pedophilic disorder for actually abusing victims, his justifying attitudes underlying the second dynamic factor were "different," so that Dr. Kuzia disagreed with the characterization that respondent's attitude was "used twice," to diagnose him and "elevate his likelihood."

¶ 20    On redirect examination, Dr. Kuzia explained that the "absolute risk rates" or recidivism percentages associated with Static-99R and Static-2002R scores are multiple numbers dependent on "which population the specific study was based" and whether a subject was "in the routine group or the high risk *** group." That was part of the reason the creators of the actuarial measures called the percentages "the least reliable" statistics from the measures.

¶ 21　On recross examination, Dr. Kuzia acknowledged that the Static-2002R now recommended that the recidivism percentages should be included in psychological opinions, but denied that the Static-2002R was therefore more reliable than the Static-99R, because "they are also saying that these numbers are the least relied-upon numbers when it comes to assessing for risk." Dr. Kuzia's opinion that respondent was substantially probable to reoffend "doesn't come out to a percentage or anything like that," but "a determination, based on clinical judgment, as to whether I think this person is substantially probable," and the actuarial measures were "a baseline" and "something to kind of get me started in the assessment."

¶ 22　Dr. Amy Louck Davis, a psychologist with the Department, testified that she conducted about 430 evaluations under the Act and had found some subjects to not be SVPs and testified on behalf of some respondents. She conducted an evaluation of whether respondent was an SVP under the Act. Her evaluation consisted of reviewing his records, including Department and prison records, and interviewing him in November 2022 with his consent. The records were of "the type reasonably relied upon by professionals in [her] field." After the record review and interview, Dr. Louck Davis made a diagnosis and performed a risk analysis. She then reached an opinion that respondent was an SVP under the Act, issuing a report to that effect in November 2022. Since that report, she reviewed additional Department records and still held the opinion to a reasonable degree of psychological certainty that respondent was an SVP.

¶ 23　In reaching her opinion, Dr. Louck Davis considered respondent's criminal history including cases where he was not convicted, which she explained to be appropriate to her evaluation because "I'm not making a consideration of guilt or innocence or the [veracity] of the information. It is about a description of behavior." She considered the same arrests and convictions

described by Dr. Kuzia, including respondent's: 1977 arrest for indecent liberties with a child; 1991 arrest for aggravated criminal sexual assault of a five-year-old; conviction in case 03 CR 12178 for the aggravated battery and child abduction of two eight-year-olds; and conviction in case 07 CR 14848 for predatory criminal sexual assault and other offenses against his three-year-old granddaughter. Respondent at points admitted and denied his offenses, including telling Dr. Louck Davis that he pled guilty in the 2007 case to end the case.

¶ 24    Dr. Louck Davis also considered it relevant to respondent's risk and potential improvement that he had not engaged in treatment while in Department custody. When she discussed treatment with respondent, he said he did not want treatment and did not like how treatment was conducted in the Department facility, calling it "brainwashing."

¶ 25    Dr. Louck Davis diagnosed respondent with pedophilic disorder and substance use disorder in a controlled environment, with the former based on "almost three decades of accusations, arrests and some convictions for sexual behavior with young children, ranging in age from three to about age eight." Respondent's substance use disorder was based on his self-described alcoholism and the fact that he had no regular access to alcohol while in custody. She opined that respondent still suffered both disorders, as neither is "known to spontaneously remit or just go away on its own." She also opined that both disorders were mental disorders under the Act as both affect his emotional or volitional capacity and predispose him to engage in further acts of sexual violence.

¶ 26    Having diagnosed respondent with mental disorders, Dr. Louck Davis conducted a risk assessment of his likelihood to reoffend, considering actuarial measures, dynamic risk factors, protective factors, and individual factors. She used the Static-99R and Static-2002R actuarial measures, which she explained to be underestimates of risk because they rely upon criminal

histories, which inherently do not include all instances of sexual violence. Respondent scored two on the Static-99R and four on the Static-2002R, both being average risk or about 50th percentile of known convicted sex offenders. However, she considered this an underestimate of risk not just because the actuarial measures were generally underestimates but because respondent being convicted of offenses at ages 46 and 50 suggested he did not reflect the general tendency for recidivism risk to reduce with age.

¶ 27    Considering dynamic risk factors, Dr. Louck Davis found eight in respondent, including deviant sexual interests, sexualized violence, sexual attitudes tolerant of sexual offenses, substance abuse, adverse childhood environment from his history of physical and sexual abuse, emotional congruence with children, and non-compliance with supervision. As an example of respondent's attitudes, he said that a child was capable of teasing him sexually and that he could not understand why a child could not have sex with adults. As examples of emotional congruence with children, respondent's offenses included "hanging around" in a park where he victimized two girls, and his explanation of being with the girl at school was that her mother left her with him. Respondent was noncompliant with supervision because he violated probation on one of his convictions.

¶ 28    Turning to possible protective factors, Dr. Louck Davis concluded that respondent's age was not a protective factor because he committed offenses in middle age. Nor was his "debilitating health" a protective factor, because, after considering his various illnesses and discussing his functionality in interviewing him, she concluded that "he does not have a medical illness that's causing such debilitation that he wouldn't be able to sex offend." Lastly, participation in sex offender treatment was not a protective factor because, while he had participated in treatment in the past, he had reoffended since and had not participated in treatment since that reoffense.

¶ 29    After her risk assessment, Dr. Louck Davis formed an opinion with a reasonable degree of psychological certainty that respondent was substantially probable to reoffend due to his mental disorders. She explained that substantial probability means "much more likely than not" but "[t]here's not a number that's associated with it or a percentage." In light of respondent's conviction in 07 CR 14848 and her diagnoses of his mental disorders, she opined he was an SVP.

¶ 30    On cross-examination, Dr. Louck Davis testified that she interviewed respondent by video for about an hour and saw him walking with a cane. She acknowledged his 2006 diagnosis with Parkinson's Disease, a "progressive debilitating disease," along with his hip replacement, shoulder surgery, seizure disorder, diabetes, and asthma, while noting that he told her that his last seizure was three years ago. However, she opined that these illnesses were not a protective factor because respondent had all of them when he committed his most recent sex offense.

¶ 31    Dr. Louck Davis acknowledged there are estimated recidivism rates associated with the actuarial measures. Her report stated that respondent's scores corresponded to a five-year recidivism rate of 4% to 5.2%, or a ten-year rate of 5.8% to 8.9%. When asked if the 5.2% recidivism rate was "a little less than 45 percent short of even being likely," the State's objection was overruled and she replied "I don't believe those are interchangeable numbers." When asked what "even odds" are in betting, the State's objection was overruled and she replied "50/50." She acknowledged that 4% is "46 below 50/50," but explained "that's not the entire picture, though, for understanding what these numbers mean relevant to an overall risk summary."

¶ 32    When asked if "that range of 4 to 5.2 percent is nowhere near 50 percent," the State's objection was overruled and Dr. Louck Davis replied "Mathematically, no, that's not." When asked if a 40-year-old is more likely to reoffend than a person 70 years old, Dr. Louck Davis

explained that respondent's scores on the actuarial measures already accounted for his age. When she was then asked if "probable is something over 50 percent," the State objected, arguing that case law prohibited equating substantial probability with a percentage. The court sustained the objection, noting that respondent could "argue that when the time comes." Dr. Loucks Davis was subsequently asked if the recidivism percentages from the actuarial measures are at most "about halfway to any kind of being likely," and she replied that the percentages are not used for determining substantial probability but as "one piece of a multi-component risk assessment."

¶ 33    Dr. Louck Davis acknowledged that respondent was not diagnosed with pedophilic disorder in other evaluations, and that a person could commit a sexually-violent offense without a diagnosis of pedophilic disorder. When asked if one of the dynamic risk factors, deviant sexual interest, was part of her diagnosis of pedophilic disorder, she explained "there's a relationship between the two, but I didn't use a risk factor to justify the diagnosis."

¶ 34    During closing argument, respondent argued, *inter alia*, "Everything they said about the risk of re-offending is, well, here's the rates and one of them goes all the way up to 26 percent. Well, that's 24 percent less than likely at all." He similarly argued that the actuarial measure "says that the typical standard is about 4 to 5.8 percent. So where do we get to the idea that we can say beyond a reasonable doubt they're going to jump from less than 10 percent to substantially more than 50, whatever that means?"

¶ 35    Following argument, the court found respondent to be an SVP. The court stated, in part, "I did take into consideration the percentages argument that counsel for the respondent made. I'm not swayed by that. I do think that Dr. Louck Davis was very clear in her responding to questions that that is one piece."

¶ 36    In his posttrial motion, respondent challenged the sufficiency of the evidence that he was an SVP. He noted that the witnesses "used actuarial measures Static 99R and Static 2002R to determine the issue of risk of reoffending," on which he scored a 2 for the former and 4 for the latter, which he claimed was "average risk." He juxtaposed Dr. Louck Davis's testimony regarding the recidivism rates associated with those scores, with a maximum of about 25%, and the witnesses' opinions that it was substantially probable that he would reoffend. Respondent argued that the State failed to prove that it was substantially probable he would reoffend because the witnesses did not adequately explain the "empirical or dynamic risk factors" to which they attributed their opinions.

¶ 37    The State responded that the witnesses adequately supported their opinions that it was substantially probable respondent would reoffend so that the evidence was sufficient to establish he was an SVP. The State argued that the witnesses "testified to various risk factors applicable to the Respondent and explained how the factors applied to him and that the presence of these factors increased his risk." The State particularly noted Dr. Louck Davis's testimony that respondent's scores on the actuarial measures were "an underestimate of his risk given the expectation with lower offending with advanced age and the Respondent's most recent offense actually happening at advanced age." The State also cited various opinions of this court rejecting arguments that the State must show a recidivism rate of more than 50% for the trier of fact to properly find a substantial probability of committing further acts of sexual violence.

¶ 38    In May 2023, the court denied respondent's posttrial motion and committed him to the Department's custody in a Department facility until further court order. This appeal timely followed.

¶ 39    On appeal, respondent contends that the trial court erred in limiting cross-examination on psychological testing of the percentages to reoffend when the State's witnesses considered uncharged offenses over respondent's age, disability, sobriety, and diseases. The State responds that the court did not abuse its discretion because Illinois courts prohibit linking the probability of reoffending to percentages, and that any error in limiting cross-examination was harmless.

¶ 40    The Act provides that the State may file in the circuit court a petition alleging that a person is an SVP if the person was convicted of certain sexually violent offenses including, as here, predatory criminal sexual assault. 725 ILCS 207/5(e), 15(b) (West 2020). The petition must further allege that the person "has a mental disorder" and "is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence." *Id.* §§ 5(f), 15(b). If after a trial the trier of fact finds beyond a reasonable doubt that the person is an SVP as alleged in the petition, the court shall commit the person "to the custody of the Department for control, care and treatment until such time as the person is no longer" an SVP. *Id.* §§ 35(a), (d), (f), 40(a).

¶ 41    The scope of cross-examination is an evidentiary ruling within the sound discretion of the trial court, so that such a ruling will not be reversed absent an abuse of discretion that manifestly prejudiced the respondent. *In re Commitment of Moody*, 2020 IL App (1st) 190565, ¶ 67. We find no error here.

¶ 42    Firstly, respondent's cross-examination was not unduly restricted and we find no abuse of discretion. Respondent was barred from asking the State's witnesses why or how their opinions that he was more likely than not to reoffend could be reconciled with his average-risk scores on the actuarial measures. That is, he was not allowed to ask the witnesses how recidivism percentages

of 25% or less on the actuarial measures supported their opinions that there was at least a 50% chance he would reoffend. However, this court has rejected the proposition that the State must prove a recidivism rate above 50% to constitute a substantial probability that a respondent will engage in acts of sexual violence. *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶¶ 23-25.

¶ 43    Notably, the trial court allowed respondent to elicit that certain recidivism percentages were related to his scores on the actuarial measures, and allowed him to *argue* that there was a fatal or damning discrepancy between the substantial-probability opinions and the recidivism percentages, only barring his *examination* of the witnesses on that particular point. The witnesses, especially Dr. Louck Davis, made clear that the actuarial measures were only a part of their risk evaluations and a part of their opinions that respondent presented a substantial probability of reoffending. Respondent was free to examine and explore the factors that the witnesses testified affected those opinions beyond the actuarial measures. Respondent could, and at some length did, cross-examine both witnesses about the dynamic factors they found relevant to his probability to reoffend and the protective factors they found inapplicable to that probability.

¶ 44    Secondly, had there been an abuse of discretion, we find it harmless because respondent cannot show he was prejudiced by the narrow limitation of his cross-examination. He argues that the "dynamic factors" cited by the witnesses "do not establish probability or likely probability, much less 'substantial probability.' " He also argues that, "[a]lthough these dynamic factors can be considered again, [respondent's] severe medical conditions and problems, particularly Parkinson's disease, which is a progressive condition, were not included in the protective factors." He argues that "they fail to mention all of [his] illnesses, age, disabilities, and sobriety."

¶ 45 However, all these issues were thoroughly examined at trial. Both Dr. Kuzia and Dr. Louck Davis explained that he or she did not consider the recidivism percentages from the actuarial measures definitive or reliable because they were percentages of only convicted instances of recidivism while many instances of sexual abuse of children do not result in conviction. "Indeed, as noted by all the experts, the factors assessed in the Static-99 and Static-2002 do not account for high-risk situations outside of formal charges and convictions." *In re Commitment of Montilla*, 2022 IL App (1st) 200913, ¶ 121.

¶ 46 This court has recognized that a persuasive psychological opinion that a respondent is more likely than not to reoffend is "grounded not only in statistical analysis but also, as urged by the developers of the Static instruments, dynamic and idiosyncratic factors to provide a holistic evaluation of the individual." *Id.* ¶ 120. Here, as to dynamic factors, Dr. Kuzia pointed to respondent's expression of offensive supporting attitudes, showing that he had not learned or internalized that they were offensive and not persuasive explanations of his actions, and that he chose to reject or eschew alcohol and sex offender treatment. Dr. Louck Davis found similar dynamic factors based on respondent's actions and statements, including victimizing girls in a park and stating he could not understand why children could not have sex with adults.

¶ 47 Possible protective factors, including respondent's illnesses, age and sobriety as he now argues, were also discussed in detail at trial. Dr. Kuzia explained that he did not consider respondent's age and health issues protective factors because his victims had been young girls, who would be susceptible to victimization by even an elderly man in poor health. Dr. Louck Davis similarly testified that she did not consider respondent's age a protective factor because he committed offenses in middle age, nor did she believe his illnesses would bar him from

reoffending. Dr. Kuzia explained that he did not consider respondent's sobriety in custody a protective factor because he was in a controlled environment and it was not tested by regular access to alcohol.

¶ 48    In sum, the State's witnesses provided ample explanation why they considered respondent more likely than not to reoffend despite the average-risk scores on the actuarial measures. The court allowing respondent to ask the witnesses to explain why 5% or 25% is not 50% would not have changed their testimony as a whole nor the outcome of the trial.

¶ 49    Accordingly, the judgment of the circuit court is affirmed.

¶ 50    Affirmed.