2022 IL App (1st) 200913

Nos. 1-20-0913 and 1-20-1172 (consolidated)

Second Division
August 9, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| *In re* COMMITMENT OF JULIAN MONTILLA, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| (The People of the State of Illinois, Petitioner-Appellee, | ) ) ) ) | No. 06 CR 80004 |
| v. | ) ) | |
| Julian Montilla, | ) ) | |
| Respondent-Appellant.). | ) ) | Honorable Michael Clancy Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the
judgment and opinion.

**OPINION**

¶ 1     This case concerns proceedings initiated under the Sexually Violent Persons Commitment

Act (Act) (725 ILCS 207/1 *et seq.* (West 2018)). Following a bench trial, respondent-appellant,

Julian Montilla, was found to be a sexually violent person (SVP) and was placed on conditional

release. On appeal, Montilla contends that the State failed to prove beyond a reasonable doubt that

he was a sexually violent person and that his conditional release plan was overbroad and unreasonable under the Act. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3                              A. The Underlying Convictions

¶ 4     In 1998, Montilla was convicted of predatory criminal sexual assault of a child (case number 98-CR-7589) and was sentenced to 6 years in the Illinois Department of Corrections (IDOC). In 1999, Montilla was convicted of aggravated criminal sexual assault (case number 98-CR-7590) and was sentenced to 6 years in the IDOC. The second sentence was to be served concurrently with the sentence of the first conviction.

¶ 5     Montilla was released on mandatory supervised release (MSR) on November 14, 2003.[1] However, in 2005, Montilla violated the conditions of his parole after admitting to his parole officer that he had drank alcohol and that one of the victims from his underlying convictions had moved into his apartment building. Additionally, Montilla admitted to having thoughts of sexually offending an underage girl he had observed at a technical college he was attending at the time. Since 2006, Montilla has been detained at the Illinois Department of Human Services Treatment and Detention Facility (TDF) in Rushville, Illinois.

¶ 6                            B. The State's Petition to Civilly Commit

¶ 7     On February 27, 2006, the State filed a petition to civilly commit Montilla pursuant to the Act, alleging that he was dangerous to others because he suffered from a mental disorder that created a substantial probability that he would engage in acts of sexual violence. The State sought

---

[1]Although the record demonstrates that Montilla was subject to MSR, the trial court, the parties, and the witnesses in this matter refer to his time spent in the community as "parole." We acknowledge the differences between the two, but for purposes of consistency within this appeal, we refer to this brief period of time as "parole."

a finding that respondent was an SVP and an order of commitment to the Illinois Department of Human Services (DHS) pursuant to section 40 of the Act. 725 ILCS 207/40 (West 2006). The State attached certified copies of Montilla's qualifying convictions as exhibits to the petition, as well as a psychological evaluation completed by Dr. Jacqueline Buck, a clinical psychologist and special evaluator with IDOC. In the evaluation, Dr. Buck diagnosed respondent with pedophilia, sexually attracted to females and males, exclusive type; alcohol abuse in a controlled environment; marijuana abuse in a controlled environment; and avoidant personality disorder with dependent features.

¶ 8    On March 28, 2006, a probable cause hearing was held. Dr. Buck testified that Montilla's mental disorders were congenital or acquired conditions that affected his emotional and volitional capacities. Dr. Buck opined that Montilla's mental disorders predisposed him to commit acts of sexual violence, his sex offender treatment to date had been totally ineffective, and he was substantially probable to sexually reoffend if he was released to the community at the end of his criminal sentences. The trial court found that there was probable cause that Montilla was an SVP and ordered Montilla to be civilly committed pending a full trial. The matter was continued for multiple years for reasons not relevant to this appeal.[2]

¶ 9    On March 26, 2019, the State filed a "Motion for Leave to Amend Petition for Sexually Violent Persons Commitment," which was granted by the trial court.[3] The amended petition attached a new evaluation, as Dr. Buck had left employment with the State, conducted by Dr. Barry

---

[2]It is unclear from the record why such a long period of time passed between the original probable cause hearing and trial. Notably, Montilla appears to have had multiple attorneys throughout the duration of the trial court proceedings.

[3]In its motion to file an amended petition, the State indicated that in May 2013, the Diagnostic and Statistical Manual (DSM-5) was republished and had modified some of the original diagnoses relied upon by the State's expert in its initial petition. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 (2013).

Leavitt, who diagnosed Montilla with pedophilic disorder, sexually attracted to females and males, non-exclusive type; alcohol use disorder, mild, in a controlled environment; and other specified personality disorder with dependent and schizotypal features.

¶ 10    The matter was again continued multiple times until February 4, 2020, when a bench trial was held.

¶ 11                                C. The Bench Trial[4]

¶ 12    Four expert witnesses testified at trial: for the State, Dr. David Suire, and three for Montilla, Drs. Leavitt, John Arroyo, and Brian Abbott. Montilla elected not to testify. All experts explained their methods for creating an evaluation under the Act, which, at minimum, considered Montilla's criminal history, IDOC disciplinary records, and treatment at the TDF. All experts also testified that they were familiar with the Act and the requirements the State had to meet to establish that Montilla was an SVP.

¶ 13                                1. The State's Expert Witness

¶ 14    The following summarizes the salient points taken from Dr. Suire's extensive testimony. Dr. Suire is a clinical psychologist. In 2006, Dr. Suire evaluated Montilla at the TDF, and concluded that Montilla met the criteria for an SVP. Dr. Suire diagnosed Montilla with three specific disorders within a reasonable degree of psychological certainty: (1) pedophilic disorder, sexually attracted to both genders, non-exclusive; (2) alcohol use disorder, mild, in a controlled environment; and (3) other specified personality disorder with dependent and schizotypal features. At the time, Dr. Suire diagnosed Montilla using the Diagnostic and Statistical Manual of Mental

---

[4]Although the bench trial lasted for two days, the testimony of the four expert witnesses is voluminous and technical. We have culled through the testimony that we deem relevant to the disposition to this appeal and recite those portions herein.

Disorders, 4th Edition (DSM-IV) (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, DSM-IV-TR (2000)), which is considered the standard reference material for psychological diagnoses and an authoritative text in the field.

¶ 15 In April 2015, Dr. Suire updated his first evaluation to conform with changes made in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 (2013)), as the fifth edition was published in 2013, as well as to review and consider any new DHS records. Dr. Suire did not reinterview Montilla for the updated evaluation. Dr. Suire completed one last updated evaluation in August 2019 but did not reinterview Montilla as he refused to participate. In both updated evaluations, Dr. Suire maintained that Montilla was an SVP.

¶ 16 Montilla had sexually offended against his 3-year-old niece and an 18-month-old to 3-year-old nephew between January to July 1997. He had performed oral sex on his niece and rubbed his penis on her vagina and had performed oral sex on his nephew. These offenses came to light when Montilla's older niece found photographs of him, visibly erect, with the same children. During Dr. Suire's interview with Montilla in 2006, Montilla admitted to committing such crimes.

¶ 17 Dr. Suire was aware of Montilla's parole violations, which included him drinking alcohol, accepting hugs and kisses from underaged nieces and nephews, and living in close proximity with a prior victim. Dr. Suire stated that Montilla had reported to his parole officer that he had considered sexually offending a girl aged 10 to 12 years whose parents worked as custodial staff at the technical college he attended while on parole. Montilla reported knowing when the girl was alone, what locations she might be at, and that he was "experiencing a lot of stress" in that he may

reoffend. Dr. Suire indicated that Montilla had denied having any sexual thoughts about children since going through treatment, which he did not find credible.

¶ 18 Dr. Suire testified that Montilla had participated in sex offender treatment while at IDOC and while on parole but had not successfully completed either and was terminated after his parole violations. He also had not participated in similar treatment while at DHS.

¶ 19 Dr. Suire opined that Montilla's diagnoses were congenital or acquired in nature and had an effect on his emotional or volitional capacity. In order to become diagnosed with pedophilic disorder, one had to suffer from recurrent urges, fantasies, or behaviors that involved sexual contact with a prepubescent child of 13 years old or younger for a period of at least six months. The six-month period did not have to be recent, only contiguous. Dr. Suire testified that Montilla had offended against at least four known children between the ages of 1 and 11 years, had reported being interested in children, mostly girls, between the ages of 3 and 4 years, and also exhibited some interest in boys but at a reduced level compared to girls. The qualifier of "non-exclusive" indicated that Montilla might have a sexual interest outside of children, as records showed that Montilla had presented a history of limited sexual contact and brief relationships with adults.

¶ 20 Dr. Suire testified that pedophilic disorder directly predisposed Montilla to commit further acts of violence because he was sexually attracted to and aroused by children, which made it likely that he would act on his arousal. Dr. Suire observed that although Montilla had reported no longer being attracted to children, he did not find such a statement credible and that it had been in Montilla's "best interest" to report this. Dr. Suire conceded that having an attraction to children did not make violence inevitable and that it was true that Montilla had not offended since he was last in the community in the 1990s. However, Dr. Suire opined that Montilla still suffered from pedophilic disorder because the diagnosis, similarly to sexual identity, tended to remain static once

it was set, even if an offender could learn to control his urges. As an example, Dr. Suire pointed out that while on parole, Montilla had identified a potential victim and possible situations in which he could reoffend.

¶ 21    Montilla also met the criteria for alcohol use disorder because Montilla had reported a heavy pattern of alcohol use and attempts to reduce consumption without success, which resulted in one of his parole violations. Dr. Suire also diagnosed Montilla with specified personality disorder due to his history of having difficulty of interacting with others. Dr. Suire testified that these two disorders would not necessarily qualify as a "mental disorder" under the Act but opined that they interacted with his pedophilic disorder to make him less likely to control his urges or make it more difficult for him to form relationships with age-appropriate individuals.

¶ 22    Next, Dr. Suire concluded that, within a reasonable degree of psychological certainty, Montilla was substantially probable to reoffend, meaning he was "more likely than not" to do so based on Montilla's diagnoses, various independent risk assessments, and consideration of Montilla's time in the community while on parole. Dr. Suire believed that Montilla had behaved in a way that exposed him to risks in the community and had engaged in high-risk behavior that involved potentially planning an offense.

¶ 23    To determine substantial probability, Dr. Suire's approach was multifaceted. First, he used an "adjusted actuarial approach," which was the "broadly accepted approach in the field." Dr. Suire explained that an actuarial instrument is a "means of combining empirical risk correlates," which produces an "overall risk estimate" that predicts how likely a person is, compared to others with similar scores, to commit a sexual offense in the future. Dr. Suire cautioned that actuarial instruments only consider formal charges and convictions, not unreported offenses, and thus were not wholly comprehensive to determine substantial probability. As such, Dr. Suire also considered

empirical risk factors not accounted for in actuarial data, such as "idiosyncratic factors" or "protective factors" that may demonstrate a heightened or mitigated risk to reoffend.

¶ 24      Dr. Suire utilized the Static-99 Revised (Static-99) and the Static-2002 Revised (Static-2002) (collectively, Static Instruments). Dr. Suire testified that the Static-99 is a 10-item scale that measures factors such as age, previous sex offenses, victim types, and romantic relationships, to produce "relative" and "absolute risk values." An offender is then assigned a score based on a potential risk to reoffend. As to the Static-2002, Dr. Suire testified that this instrument was similar to the Static-99, but was more comprehensive and also took into account time spent in the community. Pursuant to the Static Instruments, Montilla was considered to be an "average risk" to reoffend.

¶ 25      Dr. Suire then evaluated Montilla using an assessment tool called the Stable-2007, which combined additional empirical risk factors to provide an overall risk estimate. The Stable-2007 measures factors that are more "changeable" to evaluate how much progress an offender has made over time. Montilla received a score that placed him in the "high risk" category, but when his Stable-2007 scores were combined with his Static-99 and Static-2002 scores, his estimate of risk to reoffend ranged from "average" to "above average."

¶ 26      Dr. Suire also considered "idiosyncratic" and "protective" factors, which were not always reflected within the Static-99 and Static-2002. Dr. Suire opined that Montilla had placed himself in "extraordinarily high risk" situations while on parole, such as accepting kisses from very young nephews and observing a young girl at the technical college, and not immediately seeking help thereafter. Dr. Suire explained that this behavior showed that Montilla was "deep in his cycle." Dr. Suire also considered Montilla's self-admitted, unreported offenses against children, such as an

offense committed against a younger niece when he was 15 years old. However, Dr. Suire admitted that this consideration was not included in any of his evaluations.

¶ 27    As to protective factors, Dr. Suire credited Montilla for eventually seeking help with regard to the incident concerning the young girl but observed that because Montilla had not successfully completed sex offender treatment, he would have been more likely to reoffend. Dr. Suire also considered age and behavior while in IDOC and DHS, which contributed to lower Static-99 and Static-2002 scores. Dr. Suire indicated that Montilla had behaved well in both facilities, which could be informative as to one's ability to follow rules, general antisocial behavior, and one's deviant arousal.

¶ 28    On cross-examination, Dr. Suire admitted that other evaluations of Montilla had indicated that he was more capable than others in controlling his behavior. Dr. Suire agreed that Montilla had not committed an offense while on parole and that someone with pedophilic disorder might learn to not act on their urges. Dr. Suire additionally agreed that Montilla had no documented incidents of sexual misconduct at IDOC or DHS, had not been found in possession of child pornography, had not been found writing erotica regarding children, and that there was no evidence of grooming younger members in either community. Dr. Suire explained that in his evaluation, he had described Montilla's observation of the young girl at the technical college as "monitoring," which was based on his own "reasonable interpretation of what was happening." Dr. Suire stated that while it was positive that Montilla had reported, he had nevertheless put himself in a position where he was regularly around a potential victim. Dr. Suire testified that it would be fair to say that Montilla only reported his attraction to the girl at the technical college because he already had been caught violating other conditions of his parole.

¶ 29    Dr. Suire agreed that, with regard to the Static-99, Static-2002 and Stable-2007, Montilla had scored slightly less than an average offender but was still within the average range of risk. Dr. Suire also admitted that he did not report an "absolute risk value" within his evaluations and had not included any discussion regarding the difference between recidivism rates for interfamilial offenders and extra-familial offenders.

¶ 30    On redirect examination, Dr. Suire testified that even if Montilla's scores on the Static-99, Static-2002, and Stable-2007 were "low," Montilla was still substantially probable to reoffend based on the limitations of the actuarial evaluations. On recross-examination, Dr. Suire testified that the Static-99 and Static-2002 were the best estimates the psychological community had to provide moderate predictive accuracy of risks to reoffend.

¶ 31    Following Dr. Suire's examination, Montilla moved to strike his testimony and for a directed finding that the State had not met its burden in establishing that Montilla was an SVP. Specifically, Montilla argued that Dr. Suire's testimony (1) indicated that a DSM diagnosis was not the same as a "mental disorder" under the Act; (2) the State had failed to establish that Montilla was substantially probable to reoffend because his actuarial scores were low; and (3) Dr. Suire's testimony was biased, in that that he had used the words "monitoring a child" and had not included a discussion of "absolute risk values" in any of his evaluations.

¶ 32    The trial court denied the motion, and the State rested.

¶ 33                      2. Respondent's Expert Witnesses

¶ 34                           i. Dr. Barry Leavitt

¶ 35    Dr. Leavitt is a licensed clinical and forensic psychologist. In 2015, he was contacted by the State to perform an evaluation of Montilla, who did not consent to an interview. On August 4, 2015, Dr. Leavitt completed his evaluation, which concluded that Montilla met the criteria as an

SVP. Dr. Leavitt diagnosed him with pedophilic disorder, sexually attracted to both, non-exclusive type; alcohol use disorder, mild, in a controlled environment; and other specified personality disorder with dependent and schizotypal features.

¶ 36    In 2019, Dr Leavitt performed a second evaluation of Montilla. Although Dr. Leavitt's diagnoses of Montilla's mental disorders did not change, he concluded that Montilla was not an SVP because he no longer believed him to be substantially probable to commit an act of violence based on updated risk analysis instruments and recent recidivism estimates.

¶ 37    For his 2019 evaluation, Dr. Leavitt conducted a risk assessment using an adjusted actuarial approach that considered both "static risk instruments" and a "dynamic risk instrument." Dr. Leavitt utilized the Static-99 and Static-2002 to provide a baseline understanding of risk based on the presence or absence of historical factors. Dr. Leavitt testified that Montilla had scored "average risk" on the Static-99. As to the Static-2002, which evaluates more items and provides a "slightly different breakdown[ ] of categories of risk," Dr. Leavitt testified that Montilla had scored an "average risk," which was "third highest of potential categories of risk."

¶ 38    Dr. Leavitt also utilized the Stable-2007 to provide further "refinement" as to an individual's estimated recidivism rate as it measures the presence or absence of various "criminogenic needs." Dr. Leavitt scored Montilla 15 out of 26 points on the Stable-2007, which "suggested evidence of a fairly high degree of psychological vulnerabilities." Dr. Leavitt considered Montilla to be a "reclusive pedophile" in his current placement, as there was no evidence of disciplinary issues at the TDF, no attempts to secure child pornography, and only reports of positive interactions with other residents.

¶ 39    Dr. Leavitt then combined the result of the Stable-2007 with the scores of the Static-99 and Static-2002, which resulted in a "composite score" that produced an overall risk estimate. Montilla's risk was then elevated from "average risk" to "above average."

¶ 40    Dr. Leavitt also evaluated Montilla using "case-specific considerations" that could warrant elevating Montilla's risk to a higher level, such as age, health status, and completion of sex offender treatment. Dr. Leavitt observed that in 2000 while at IDOC, Montilla had been terminated from the program because he had been "struggling with understanding and implementing recommended concepts, and was not seen as an active participant." Dr. Leavitt stated that while on parole, Montilla had not been fully transparent or compliant with his conditions due to cognitive and intellectual deficits. Dr. Leavitt credited Montilla's "minimal levels of engagement" in that he reported his sexual attraction and deviant fantasies to his parole officer in 2005. Dr. Leavitt also observed that most of Montilla's victims had been interfamilial and explained that research suggested that those who only offend against family members might have a reduced risk level compared to those offending against non-family members.

¶ 41    In explaining why he had changed his opinion as to whether Montilla was an SVP, Dr. Leavitt testified that he did not feel Montilla's risk level reached the threshold of "substantial probability" after reviewing updated records and taking into account "recent norms" regarding recidivism rates. Dr. Leavitt testified that recidivism rates for reoffending "were different" in 2015 than in 2016 and 2017 and that rates had gone down for sex offenders generally. Additionally, Dr. Leavitt explained that some of the empirical risk factors assessed in the Static-99 and Static-2002 "overlap" with those in the Stable-2007 and thus do not provide any new information to consider.

¶ 42    On cross-examination, Dr. Leavitt agreed that Montilla suffered from pedophilic disorder, had admitted to sexually offending against at least five females, had demonstrated an interest in

prepubescent females, and had fantasized about potentially offending against a 10-year-old girl. Dr. Leavitt admitted that Montilla's sexual interests had been "ingrained" up until his time at DHS and that there was no evidence to suggest that they had been resolved in any way. Dr. Leavitt did not find Montilla's statements that he was no longer interested in children as consistent with someone who had not consistently participated in sex offender specific treatment, and it would be fair to say that he had not taken any meaningful steps to address his sexual interest in children. Dr. Leavitt agreed that any treatment at DHS was not a substitute for sex offender treatment. Dr. Leavitt also described the potential incident with the underaged, unrelated girl at the technical college "as an almost imminent sex offense." He testified that Montilla had only discussed these sexual thoughts after being caught for other parole violations.

¶ 43    On cross-examination, Dr. Leavitt testified that Montilla's alcohol use disorder and other specified personality disorder were not qualifying mental disorders under the Act but served as risk or disinhibiting factors that were connected to sexual reoffending. He also indicated that Montilla's dependent personality features may lead him to seek out children as a source of care or support.

¶ 44    On redirect examination, Dr. Leavitt testified that an individual's sexual interest can fluctuate over time and that Montilla could "greatly benefit" from sex offender treatment. Dr. Leavitt testified that he had estimated Montilla to have a 14% to 15% percent risk of reoffending over the next 5 to 10 years, but he did not see that percentage as reaching the "substantial probability" threshold.

¶ 45    The trial court then questioned Dr. Leavitt regarding the change in his opinion. Dr. Leavitt testified that the main difference between his 2016 opinion and his 2019 opinion was that the actuarial instruments had changed and that his prior evaluation may have "overweighed" dynamic

factors. In 2015, evaluators could not utilize the Static-99 with the Stable-2007 to get a composite score, and thus the 2015 evaluation was comprised of scores from separate instruments, with additional risk factors weighed accordingly based on the psychologist's discretion.

¶ 46     The trial court noted that the new actuarial instruments actually placed Montilla at a higher absolute risk value. Dr. Leavitt responded that he believed that the new risk level was still below what he perceived as "substantial probability" and that there was no evidence of Montilla acting on his urges. Further, Dr. Leavitt testified that the new composite score calculated already-considered risk factors more than once, which would drive up a composite score.

¶ 47                               ii. Dr. John Arroyo

¶ 48     Dr. Arroyo is a licensed clinical and forensic psychologist. Dr. Arroyo conducted his first evaluation in January 2015 and then updated his evaluation in January or February 2018. Dr. Arroyo attempted to interview Montilla for the first evaluation, but Montilla refused. Dr. Arroyo explained that he had created a second evaluation because significant time had passed and he had received additional information. Dr. Arroyo testified that his opinions remained the same in both evaluations, where he did not believe, to a reasonable degree of psychological certainty, that Montilla met the criteria as an SVP under the Act.

¶ 49     In both evaluations, Dr. Arroyo diagnosed Montilla with a mental disorder, specifically pedophilic disorder, non-exclusive type, sexually attracted to females, incest only.

¶ 50     In determining substantial probability to reoffend, Dr. Arroyo also conducted a risk assessment utilizing the Static-99, Static-2002, and Stable-2007. On the Static-99, Montilla scored an "average risk" in the bottom range of the category. As to the Static-2002, Montilla scored "average risk" on this instrument, and Dr. Arroyo added some points to this evaluation based on the fact that Montilla had reported offending against a nephew, although he did not believe that

offending against one nephew constituted a pattern of behavior. Dr. Arroyo testified that he also perceived risk of reoffending to be lower if an offender only has intrafamilial victims but stated that the Static-99 and Static-2002 do not account for solely interfamilial violence.

¶ 51 Dr. Arroyo then utilized the Stable-2007, but noted that the Stable-2007 is typically only used when one conducts an interview of that individual, which he had not done in this case. Dr. Arroyo scored Montilla "outside of the moderate range of dynamic needs," indicating he was "low risk."

¶ 52 Dr. Arroyo also considered protective factors, such as age, medical condition, and completion of sex offender treatment. He explained that age was already accounted for by the actuarial instruments and that Montilla had engaged in sex offender treatment and had expressed remorse for his victims.

¶ 53 Dr. Arroyo admitted that the Static-99 and Static-2002 underestimate reoffense rates because they largely only measure formal legal interventions and that the developers of the actuarial instruments advised evaluators that the items on the list are not an "exhaustive or comprehensive list" and should not be used as "stand-alone instruments to evaluate risks." He also stated that the actuarial instruments do not evaluate past a five-year time period. Dr. Arroyo admitted that he did not score Montilla for the incident with the underaged girl at the technical college because his previous reported victims had been family members.

¶ 54 On cross-examination, Dr. Arroyo testified that he did not consider "dynamic risk factors" but believed that treatment could address those issues in the future. Dr. Arroyo considered Montilla's lack of disciplinary history at IDOC as "normal" but also conceded that he had been removed from sex offender treatment. Dr. Arroyo agreed that Montilla had not had access to

children or been to sex offender treatment in at least 15 years and had not researched whether a 15-year gap from participation in treatment had any discernible effect on an individual.

¶ 55    On redirect examination, Dr. Arroyo testified that, based on the Static-99, if an individual has "stranger victims," an individual has a higher risk to reoffend. Dr. Arroyo opined that risk of reoffending minimizes as the offender ages because an offender's preference to offend against certain age groups dissipates because potential victims are also aging as well.

¶ 56    The trial court further questioned Dr. Arroyo as to how age affects pedophilia. Dr. Arroyo stated that pedophiles have a decreased risk of offending over time if they are solely offending against family members. Dr. Arroyo also opined that, for child sex offenders who begin offending in their 20s, pedophilia tends to peak in their late 50s.

¶ 57    On redirect examination, Dr. Arroyo stated that Montilla fell into the category of those who began offending earlier. On recross examination, Dr. Arroyo testified that as Montilla aged, the victim pool decreased. On redirect examination, Dr. Arroyo testified that Montilla had not offended against any of his victims' children while on parole.

¶ 58                              iii. Dr. Brian Abbott

¶ 59    Dr. Abbott is a licensed clinical psychologist and social worker. Dr. Abbott testified that he interviewed Montilla on May 20, 2016, and utilized that information to complete his report, dated December 28, 2016. Dr. Abbott testified that he reviewed updated information since the drafting of the report, but none of the updated records changed his opinion about whether Montilla qualified as an SVP.

¶ 60    Dr. Abbott testified that he did not diagnose Montilla with pedophilic disorder in 2018 because there was an "absence" of any symptoms of pedophilia disorder over a period of 15 years. Dr. Abbott did not dispute that Montilla suffered from pedophilic disorder *earlier* in his life, likely

between the years 1997 to 2005, but that it was inappropriate to diagnose Montilla with pedophilic disorder now as the diagnosis would be based on old behavior and the DSM-5's diagnoses are based on "current conditions."

¶ 61 Dr. Abbott testified that the mere presence of a DSM-5 disorder is insufficient to establish someone's behavior in the future and offers no relevant or probative information as to how an individual's emotional or behavior control predisposes him to commit acts of sexual violence. He indicated that he was not aware of any scientific evidence that individuals who suffer from pedophilic disorder will continue to exhibit such conditions over their lifetime, absent any symptoms. Dr. Abbott testified that Montilla exhibited symptoms of expressing remorse and recognition of the consequences of his actions, which appeared to be a change in him since when he had committed the offenses. Dr. Abbott also noted that there was evidence of Montilla engaging in an adult relationship when he had been released on parole, thus demonstrating maturation in his social, emotional, and sexual development with adult women.

¶ 62 Dr. Abbott indicated that he did not address "volitional control" in his evaluation because he had concluded that Montilla did not have a current acquired congenital condition. Thus, he only addressed this aspect hypothetically, and based on his review of Montilla's behavior at the TDF, he did not see evidence of him exhibiting any institutional signs of difficulty in controlling any sexual urges.

¶ 63 Although he did not believe Montilla suffered from a current acquired or congenital disorder, Dr. Abbott nevertheless conducted a risk assessment under the assumption that he did. Dr. Abbott concluded that any theoretical risk to reoffend was low, "short of any statement that Montilla intended to reoffend," and that there was no "statistical, logical, or common sense basis" for him to find that Montilla was substantially probable to reoffend.

¶ 64    Dr. Abbott testified that he used the Static-99 and then also considered "extraordinary factors" that might affect risk, as well as time spent in the community. Dr. Abbott scored Montilla as "average" on the Static-99 but explained that the Static-99 may be inaccurate as to risk perception based on the age of the offender. Additionally, Dr. Abbott pointed out that the Static-99 and Static-2002 do not assign any point values to factors such as recognition of the consequences of one's actions, which could degrade predictive accuracy. As such, he also consulted research regarding "age-stratified sexual recidivism" that showed that younger offenders are "overrepresented" in the Static-99 and thus may contribute to "inflated" risk estimates.

¶ 65    On cross-examination, Dr. Abbott testified that he last had contact with Montilla in 2016. He believed Montilla was in "remission" for pedophilic disorder but also admitted that the DSM-5 did not include a "qualifier for remission" for pedophilic disorder. Dr. Abbott testified that, to be in remission for pedophilic disorder, one had to not have shown symptoms of impairment or distress in the community for at least five years. He stated that Montilla had only been in the community for about two or three years while on parole.

¶ 66    Following redirect and recross-examination, Montilla rested. The bench trial concluded after closing arguments.

¶ 67                                    D. Trial Court's Ruling

¶ 68    On February 24, 2020, the trial court issued its oral ruling. The court began by noting that, under the Act, the State had to prove beyond a reasonable doubt, that Montilla (1) had committed an act of sexual violence, (2) had a mental disorder that was a congenital or acquired condition affecting his emotional or volitional capacity that predisposed him to engage in acts of sexual violence, and (3) was dangerous to others because the mental disorder created a substantial probability that he would engage in acts of sexual violence.

¶ 69    As to the first element, the court found that the State demonstrated that Montilla had committed qualifying acts of sexual violence, namely predatory criminal assault and aggravated criminal sex assault.

¶ 70    As to the second element, the court held that the State had met its burden in establishing that Montilla suffered from a current qualifying mental disorder, namely pedophilic disorder, that was congenital or acquired in nature. In so concluding, the court stated that it had considered the opinions and diagnoses of all evaluators. The court observed that Montilla had a 17-year history of offending against prepubescent children and that, while on parole, his pedophilic sexual orientation had expanded beyond his family to an underaged female stranger. The court acknowledged that the DSM-5 did not formally consider pedophilic disorder as an actual disorder until the offender is at least 16 years old, but that three of the expert witnesses had diagnosed him with pedophilic disorder to varying degrees. Finally, the court explained that it gave less weight to Dr. Abbott's opinion and testimony that Montilla did not suffer from pedophilic disorder because it found Dr. Abbott's testimony to be inconsistent with the DSM-5 and the opinions of the other three experts.

¶ 71    As to the third element, the court held that the State had established that there was a substantial probability that Montilla would engage in acts of sexual violence. The court considered that the actuarial risk assessments utilized by the experts were known to have "moderate predictive accuracy" but indicated that they were not "stand-alone instruments" because they were known to underestimate risk by limiting the time period evaluated and only considered arrests and convictions. The court stated it was not limited to such considerations when determining substantial probability.

¶ 72    The court found Dr. Suire's opinion and testimony persuasive where Dr. Suire considered Montilla's criminal history, patterns of behavior, diminished inhibitions while drinking, risk assessment, diagnosis of pedophilic disorder, static sexual attraction or arousal to children, behavior on parole, and failure to complete sex offender treatment.

¶ 73    The trial court gave less credit to Montilla's expert witnesses because they had all been "inconsistent in how they arrive[d] at th[e] opinion" that he was not an SVP. As to Dr. Leavitt, the court stated that he had been "inconsistent in his opinion, and even with himself." The court noted that, in 2015, Leavitt had opined that Montilla was an SVP but, in 2019 and 2020, opined that he was not. The court observed that the main change was Dr. Leavitt's usage of the Stable-2007. However, the court noted that the developers of the Stable-2007 have instructed evaluators *not* to use the instrument if, like Dr. Leavitt, the evaluator had not interviewed the subject. The court further reasoned that Dr. Leavitt's methodology conflicted with that of Dr. Arroyo, who had not formally scored with the Stable-2007, and Dr. Abbott, who found "no utility" in scoring dynamic risk factors. The court also highlighted that Dr. Leavitt had described the incident with the underage female at the technical college as "almost imminent."

¶ 74    As to Dr. Arroyo, the court stated that his opinion had disregarded that Montilla had performed oral sex on his 18-month-old nephew. Dr. Arroyo, according to the court, had also disregarded that, while Montilla was on parole, his sexual interest had adapted and expanded to a non-family member, thus indicating an interest outside of his family.

¶ 75    As to Dr. Abbott, the court rejected his opinion because he had not diagnosed Montilla with pedophilic disorder and had not considered Montilla's interactions with the underaged girl at the technical college or that Montilla had experienced thoughts of reoffending while on parole. Although the court observed that Dr. Abbott and Dr. Leavitt had testified that recidivism rates

were lower as to interfamilial offenders, it discounted their opinions because they disregarded Montilla's potential offending against a non-family member. The court also observed that Dr. Abbott did not consider dynamic risk factors, which contradicted the instructions of the developers of the Static-99, and that Dr. Abbott's emphasis on Montilla's lack of offending was "misplaced" because he had been committed at the TDF for the past 15 years.

¶ 76    The court considered dynamic risk factors, noting that Montilla had failed to address various psychological vulnerabilities, such as emotionally identifying with children, impulsivity, difficulty regulating, strong preoccupation with children, sex as a coping mechanism, and deviant sexual preference. The court observed that Montilla had not developed any coping skills through treatment to avoiding reoffending, which constituted a "huge problem for Montilla and the community if he [were to be] released today."

¶ 77    Last, the court considered protective factors, which were age, health, and treatment. The court noted that Montilla was 54 years old, which reduced his risk to an extent, and there was no evidence of health issues in the record. The court reiterated that Montilla had not completed treatment while at IDOC and had not participated in treatment in 15 years at DHS. The court stated that the failure to complete treatment was the most important of the protective factors because "something [would] need[] to change with the respondent if we are to expect different outcomes."

¶ 78    The trial court concluded that the State had proven beyond a reasonable doubt that Montilla was an SVP and entered judgment for the State. Additionally, the court ordered DNA analysis, set a date for posttrial motions, and continued the case for a dispositional hearing.

¶ 79                                E. Posttrial Motions

¶ 80    On March 23, 2020, Montilla filed a motion for a new trial, or in the alternative, a motion for judgment notwithstanding the finding of SVP. Therein, Montilla argued, among other things,

that the State had failed to prove he was an SVP and that the trial court's judgment was against the manifest weight of the evidence. The State did not file a written response.

¶ 81　On July 16, 2020, the trial court denied the posttrial motion in its entirety. In that same order, the trial court addressed a new dispositional report from Dr. Suire, created in April 2020, which opined that Montilla could be eligible for conditional release if he was willing to engage in sex offender treatment. Dr. Suire indicated that Montilla should remain at the TDF pending DHS's creation of a conditional release plan for him. Thus, the court ordered DHS to create a conditional release plan pursuant to sections 40(b)(4) and 60(f) of the Act (725 ILCS 207/40(b)(4), 60(f) (West 2018)).

¶ 82　　　　　　　　　　　F. Conditional Release Plan

¶ 83　Pursuant to the trial court's order, DHS created a conditional release plan for Montilla that contained 67 explicit conditions. The conditional release plan also required Montilla to participate in sex offender treatment, alcohol and substance abuse treatment, service referrals, monitoring, and community service notifications.

¶ 84　The conditional release plan outlined procedures in the event that Montilla violated any of the conditions. We summarize those conditions relevant to this appeal. Condition 11 required Montilla to become employed and work with his DHS case management team to create a budget. Condition 28 required Montilla to comply with "all other special conditions" imposed by his conditional release agent and DHS case management team that would restrict Montilla from high-risk situations and limit his access to potential victims. Condition 33 imposed various limitations on Montilla relating to his electronic and internet access and required him to submit to a forensic evaluation of any of his devices. Condition 41 required Montilla to remain at his home during holidays and refrain from travel without permission from his case management team. Condition

57 required Montilla to restrict contact with animals and prohibited him from being present at a zoo, petting zoo, circus, or where animals might be present to attract children. Finally, condition 67 required Montilla to comply with all previous conditions and to inquire as to whether any such activity was permissible prior to engagement.

¶ 85    On September 14, 2020, the parties appeared before the trial court, where Montilla presented various objections to the proposed plan. The court overruled all of Montilla's objections and approved the conditional release plan in its entirety. Montilla subsequently agreed to all the required conditions via signature, and the order for conditional release was entered on September 16, 2020.

¶ 86    This appeal followed.[5]

¶ 87                                          II. ANALYSIS

¶ 88    On appeal, Montilla argues that the trial court's judgment should be reversed for two reasons. First, Montilla contends that the State failed to meet its burden of proving beyond a reasonable doubt that he is a sexually violent person under the Act. Second, in the event that this court affirms the trial court's judgment, Montilla argues that this court should find that various provisions of his conditional release plan are invalid as they exceed the scope of the Act, are unreasonable, and do not bear a relationship to the purposes of commitment under the statute.

¶ 89                                          A. Mootness

_____

[5]Montilla first filed a notice of appeal on July 29, 2020, following the trial court's ruling that Montilla was an SVP. A second notice of appeal was filed on September 14, 2020, after the trial court approved the conditional release plan. The July 29, 2020, notice of appeal had previously been assigned to appeal number 1-20-0913. The September 14, 2020, notice of appeal was assigned to appeal number 1-20-1772. Montilla moved to consolidate both appeals, and we granted the motion on November 24, 2020.

¶ 90    As a preliminary matter, we must first discuss a series of events and their significance to this appeal, particularly as to Montilla's challenge to his conditions of release. During the pendency of this appeal, the State petitioned to revoke Montilla's conditional release due to his violation of condition 6, which required him, in pertinent part, "to attend and fully participate in treatment and behavioral monitoring including, but not limited to, medical, psychological, or psychiatric treatment; and to comply with all the rules of the treatment provider." According to the stipulated trial court order entered on August 4, 2021, Montilla failed to disclose deviant sexual thoughts in a timely fashion while on conditional release and exposed himself to a female nurse at the TDF. Further, Montilla stipulated that he did "not believe he was presently ready for conditional release." Thereafter, his conditional release was revoked, and Montilla has since been committed at the TDF.[6]

¶ 91    Montilla concedes that his challenge to various portions of his conditional release plan is technically considered moot. Nevertheless, Montilla urges us to consider his challenge pursuant to the "capable of repetition, yet evading review" exception to the mootness doctrine. Montilla reasons that his time on conditional release was too short to permit appellate review and that there is a reasonable expectation that he could be subject to the same conditions in the future because the Act requires him to be periodically examined every year.

---

[6]Pursuant to section 40(b)(4) of the Act, "[a]t any time during which the person is on conditional release, if the Department determines that the person has violated any condition or rule, or that the safety of others requires that conditional release be revoked, the Department may *** request the court to issue an emergency ex parte order *** to take the person into custody." 725 ILCS 207/40(b)(4) (West 2018). The State must file a petition to revoke conditional release, which must be heard within 30 days. *Id.* If the trial court finds that a rule or condition has been violated, the court may revoke the order for conditional release and place the individual in an appropriate institution until the individual is either discharged or again placed on conditional release pursuant to sections 65 and 60 of the Act (*id.* §§ 60, 65), respectively. *Id.* § 40(b)(4).

¶ 92   The State disagrees with Montilla's attempt to avail himself of this exception.[7] The State contends that, generally, terms of conditional release are not "too short to be fully litigated" and that Montilla's current predicament is a result of his own failure to abide by the conditions. Further, the State argues that Montilla is unable to demonstrate a "substantial likelihood" that the issues presented in the current appeal would have any bearing on any subsequent appeals or that the trial court would again impose conditional release, let alone the same restrictions, on Montilla in the future.

¶ 93   At the outset, we note that neither party has provided this court with a report of the proceedings discussed hereafter and have only filed supplemental briefs addressing this issue. Indeed, the State is the only party that provided this court with a copy of the stipulated revocation order. It is well established that "an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Thus, in the absence of such records, it is "presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Id.* at 392. Any doubts regarding the incompleteness of the record are, as always, "resolved against the appellant." *Id.*

¶ 94   "An appeal is moot if no controversy exists or if events have occurred which foreclose the reviewing court from granting effectual relief to the complaining party." *In re Shelby R.*, 2013 IL 114994, ¶ 15 (citing *In re Marriage of Peters-Farrell*, 216 Ill. 2d 287, 291 (2005)). Generally, reviewing courts do not rule upon moot questions, render advisory opinions, or consider issues where the outcome will not be affected regardless of how those issues are decided. *In re Barbara*

---

[7]The State attached the "Stipulation and Order" to its supplemental response. Over Montilla's objection, we entered an order allowing it to be considered. Our review of the record shows no other documentation from the parties regarding the interceding events, including the State's petition to revoke conditional release, apparently filed on February 2, 2021.

*H.*, 183 Ill. 2d 482, 491 (1998). However, there are multiple recognized exceptions to that rule. *Shelby R.*, 2013 IL 114994, ¶ 15. One such exception is the "capable of repetition, yet evading review" exception, which seeks to address events of short duration that would otherwise be considered moot. (Internal quotation marks omitted.) *Barbara H.*, 183 Ill. 2d at 491. To avail itself of this exception, the complaining party must demonstrate that (1) the challenged action is of a duration too short to have been fully litigated prior to its cessation and (2) there must be a reasonable expectation that the complaining party would be subject to the same action in the future. *In re Alfred H.H.*, 233 Ill. 2d 345, 358 (2009).

¶ 95    Montilla contends that our supreme court's opinion in *Barbara H.* is persuasive and applicable here. We disagree. In *Barbara H.*, the trial court ordered the respondent to be involuntarily hospitalized under the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 *et seq.* (West 1996)), which included the forced administration of psychotropic medication for a period of 90 days. *Barbara H.* 183 Ill. 2d at 487-88. On appeal, our supreme court held that, although the 90 days in which the medication was to be administered had long since passed, it could nevertheless review the matter pursuant to the "capable of repetition, yet evading review" exception. (Internal quotation marks omitted.) *Id.* at 491.

¶ 96    The court reasoned that the matter was otherwise capable of evading review because the statute provided for involuntary hospitalizations of no longer than 180 days and forced administration of medication for no longer than 90 days. Thus, as to the first requirement, the court determined these periods to be "far too brief to permit appellate review" because "[i]n virtually every case, the challenged commitment and medication orders will expire before appellate review [could] be completed." *Id.* at 492. The court further observed that applying "the mootness doctrine under these circumstances would mean that recipients of involuntary mental health services would

be left without any legal recourse for challenging the circuit court's orders" and any right to appeal "would be rendered a nullity." *Id.* As to the second requirement, although the court did not have any insight as to the respondent's current status, the court observed that the record demonstrated that the respondent had a history of mental illness, including involuntary hospitalization, and thus believed it was "reasonable to expect that the same action taken against her in this [instant] case may confront her again." *Id.*

¶ 97    *Barbara H.* is distinguishable. As to the first requirement of the exception, the provisions of the Act before us do not implicate the same urgent time concerns outlined in *Barbara H* which involved an entirely separate statute. The relevant statute in *Barbara H.* involved brief timelines that implicitly prevented appellate review, while the time frames mandated under the Act in this case are broader, indefinite, and allow sufficient time for appellate review. Indeed, Montilla's terms of conditional release were not limited to a specific 90- or 180-day time frame, thus allowing for him to fully exercise his right to appeal, and his conditional release was not revoked until nearly a year and a half after judgment was entered.

¶ 98    Montilla asks us to also consider the time frame outlined in another provision of the Act, specifically section 55, as similar to the one in discussed *Barbara H.* We again do not find such a similarity. Section 55 of the Act governs the annual process by which an individual committed to the custody of DHS may seek to review the finding of SVP. Specifically, DHS is mandated to provide a written report to the trial court every 12 months to assess whether an individual is still considered to be a sexually violent person. See 725 ILCS 207/55 (West 2018). Upon review, either the State or the individual may choose to file a petition for discharge if there is cause to show that he or she is no longer a sexually violent person. *Id.* § 65. These provisions involve discharge from commitment, as opposed to terms of conditional release, and are thus inapplicable.

¶ 99    Because we have found that Montilla cannot satisfy the first element of the exception, we need not address the second. Although we are mindful of the numerous restrictions placed on Montilla at the time of original judgment, we cannot say that the circumstances in the case warrant invoking an exception to the mootness doctrine. As such, we find Montilla's claims regarding his conditional release plan to be moot and we will not consider them.

¶ 100                                    B. Sufficiency of the Evidence

¶ 101   We now turn to Montilla's primary challenge, whether the trial court erred in finding that Montilla was an SVP. Montilla argues that (1) the evidence was insufficient to establish a mental disorder as defined by the Act and (2) the evidence was insufficient to establish that he was substantially probable to engage in acts of sexual violence.

¶ 102   When assessing the sufficiency of the evidence, " 'we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt.' " *In re Commitment of Adams*, 2021 IL App (1st) 182049, ¶ 58 (quoting *In re Commitment of Fields*, 2014 IL 115542, ¶ 20). The Act before us is a civil commitment statute but requires the State to meet its burden of proof beyond a reasonable doubt. See 725 ILCS 207/20 (West 2018) ("The proceedings under this Act shall be civil in nature."); see also *id.* § 35(d)(1)-(2) (the State has the burden of proving the allegations of SVP petition beyond reasonable doubt); see also *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 54 ("While proceedings under the SVP Act are civil in nature [citation], they implicate sixth amendment rights," which make the "proceedings quasi-criminal in nature."). Our review "does not permit us to reweigh the evidence or second-guess the credibility judgments of the trial court," and we will not retry the defendant. *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 65. "Rather, the trier of fact is charged with evaluating the credibility of the witnesses, resolving conflicts in

the evidence, and deciding what reasonable inferences to draw from the evidence." *Adams*, 2021 IL App (1st) 182049, ¶ 58.

¶ 103   The Act defines a "sexually violent person" as

> "a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of a sexually violent offense by reason of insanity and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2018).

Accordingly, to establish that Montilla is an SVP, the State must prove beyond a reasonable doubt that (1) Montilla was convicted of a sexually violent offense, (2) he has a mental disorder, and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence. *Id.* §§ 35(d)(1)-(2), 5(f). Under the Act, a mental disorder is defined as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b).

¶ 104   Montilla does not challenge the first element, *i.e.* that he was convicted of a sexually violent offense. Thus, our analysis is focused on the second and third elements: whether the State proved that Montilla has a mental disorder and, if so, whether that mental disorder makes it substantially probable that he will engage in acts of sexual violence.

¶ 105                              i. Mental Disorder Under the Act

¶ 106   Montilla contends that the evidence at trial was insufficient because the State failed to prove the existence of a mental condition that is current and either congenital or acquired in nature, where none of the experts expressly testified that he was diagnosed with either a congenital or

acquired condition. The State responds that the evidence was sufficient because Dr. Suire testified that Montilla's condition was likely a combination of both.

¶ 107   We disagree with Montilla that the State did not meet its burden to prove a mental disorder that is either a congenital or acquired condition under the Act. All four experts in this case assessed Montilla pursuant to the DSM-5 as the main authoritative text for determining the presence of a mental disorder. Although one of Montilla's experts believed that Montilla did not *currently* suffer from pedophilic disorder, three other experts disagreed with this conclusion. Further, the State's expert witness's testimony was sufficiently detailed to support his conclusion of the presence of Montilla's qualifying mental disorder, which was derived from his review of all relevant file records, any interviews with Montilla, past evaluations, and Montilla's time spent in the community while on parole. Although Dr. Suire was unable to offer any opinion as to whether the condition was congenital or acquired, he testified that pedophilic disorder tended to remain static, even if an offender was not in the presence of prepubescent victims for some time. Based upon this evidence, the trial court found Dr. Suire's testimony to support the State's burden, and we will not disturb this finding on appeal.

¶ 108   Our conclusion is bolstered by this court's recent decision in *In re Commitment of Moody,* 2020 IL App (1st) 190565. There, respondent, like here, was found to be sexually violent under the same statute, and argued on appeal that the State failed to meet its burden by not proving that he suffered from a condition that was either congenital or acquired as required under the Act. *Id.* ¶¶ 47, 54.

¶ 109  The *Moody* court initially observed that the respondent's request to interpret the requirements of the Act was a question of law subject to *de novo* review, especially when considering that our supreme court " 'ha[d] not given us guidance as to what sort of factual

predicate suffices to establish the presence of a mental disorder.' " *Id.* ¶¶ 48, 55 (quoting *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36). Adhering to the well-settled canons of statutory interpretation, the *Moody* court determined that the Act "d[id] not require the State to prove with specificity whether [a] respondent's mental disorder [was] 'congenital or acquired'." *Id.* ¶ 56. Indeed, *Moody* noted, the statute did not define either term, and thus, "the most natural reading of the [Act] is that a mental disorder is any condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence, *whether congenital or not*." (Emphasis added.) *Id.* ¶ 57. Accordingly, *Moody* concluded that the legislature did not intend to require the State to prove either a congenital or acquired condition; it simply needed to prove *a condition* to effectuate its purpose of "protecting society from individuals, whose conditions affect their emotional or volitional capacity *** regardless of the precise origin of those diagnosed conditions." *Id.* (citing *In re Detention of Lieberman*, 201 Ill. 2d 300, 319 (2002)). *Moody* noted that "in the more than 20 years since passage of the Act, our courts have entertained sufficiency of evidence challenges without any discussion of whether a respondent's mental disorders were *** congenital or acquired." *Id.* ¶ 58; see also *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 61 ("We agree with *Moody* that under its plain and ordinary meaning, the Act does not require the State to prove with specificity whether the respondent's mental disorder is congenital or acquired." (Internal quotation marks omitted.)).

¶ 110   The statutory interpretation issue discussed in *Moody* differs slightly from the one before us today but requires no further reinterpretation of the Act. Here, Montilla seeks to further split hairs by asking us to make a determination that a DSM-5 diagnosis is not necessarily indicative of having a "mental disorder" as required by the Act. Montilla's request asks us to again step into the shoes of the legislature when we have already recently taken on that task. Admittedly, the term

"condition" within the Act is undefined, and there is nothing in the Act that mandates that a DSM-5 diagnosis on its face qualifies as a "mental disorder." See *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 46. However, "[t]o require the term *condition* *** to mean only psychological diagnoses *** would be to read a [requirement] into the Act that the legislature did not expressly set forth." (Emphasis in original.) *Id.* Further, it is not the job of a reviewing court to determine whether a particular diagnosis satisfies the State's burden. Rather, it is the

> " 'factfinder [who] has the ultimate responsibility to assess how probative a particular diagnosis is on the *legal* question of the existence of a 'mental disorder'; the status of the diagnosis among mental health professionals is only a step on the way to that ultimate legal determination. The methodology and the outcome of any mental health evaluation offered as evidence is a proper subject for cross-examination, and we would expect that, in the ordinary case, such efforts would expose the strengths and weaknesses of the professional medical opinions offered.' " (Emphasis in original.) *Id.* ¶ 42 (quoting *McGee v. Bartow*, 593 F.3d 556, 569, 577 (7th Cir. 2010) (discussing federal and state courts' reluctance to require state legislatures "to adopt any particular nomenclature in drafting civil commitment statutes" given the diversity of medical opinion as to what constitutes mental illness)).

In light of the above, we choose not to read into the statute requirements that do not exist, as we run the risk of inserting ourselves into a scientific discussion that is best left to experts. Simply put, the State's burden under the Act requires proof of a mental disorder that is either a congenital or acquired condition, and the trial court is the best arbiter of whether the State has presented sufficient evidence to meet that burden.

¶ 111    Despite this, Montilla contends that the *Moody* court's interpretation of the Act was wrong and should not have any precedential bearing on our resolution of this appeal. He maintains that *Moody* incorrectly conflated "diagnosis" with the requisite finding of "mental disorder" under the Act. The State interprets Montilla's argument as a call to depart from *stare decisis*, which improperly seeks to relitigate a settled point of law issued less than one year ago. The State further responds that Montilla cannot demonstrate any "good cause" or "compelling reason" to depart from *Moody*, which comports with our current body of case law interpreting the Act as well as *Murray*. We agree and decline Montilla's entreaty to depart from the sound reasoning in *Moody*.

¶ 112    As a further attempt to defeat our reliance on *Moody*, Montilla also contends that it is incompatible with guiding supreme court precedent regarding the standards of expert witness testimony as set forth in *People v. Murray*, 2019 IL 123289. In *Murray*, our supreme court articulated the level of sufficiency for expert witness testimony in criminal cases (*id.* ¶ 31), and a sufficiency argument as it relates to expert witness testimony was raised and rejected in *Moody*, 2020 IL App (1st) 190565, ¶¶ 51-53. We find it helpful to briefly discuss *Murray*.

¶ 113    *Murray* concerned the sufficiency of expert testimony to sustain a criminal conviction for unlawful possession of a firearm by a street gang member. *Murray*, 2019 IL 123289, ¶ 1. At trial, the State introduced the testimony of a police detective who specialized in street gangs and gang activities. *Id.* ¶ 6. On appeal, our supreme court agreed with the defendant's contention that the detective's testimony had been insufficient to meet the state's burden under the requisite statute. *Id.* ¶¶ 21, 34. *Murray* observed that the detective's testimony failed to establish the causal connection between his specialized knowledge and the individual defendant. *Id.* ¶ 34. The court observed that the rules of evidence "unambiguously require[d]" that an expert "articulate the reasons for his [or her] opinion." *Id.* ¶ 31. The court noted that although an expert is not obligated

to "bring forth the underlying facts and data" of which the opinion was based, merely identifying the source of those facts and data without explanation was insufficient to prove the elements of the offense. *Id.* The court rejected "general reference[s]" to the sources of the underlying facts and stated that sufficient expert testimony on "an ultimate issue or conclusion" must "thoroughly explain[ ]" the analytic process and methodology. *Id.* ¶¶ 34, 33.

¶ 114 Returning to *Moody*, there, respondent argued that two of the State's expert witnesses only gave "canned opinions that parrot[ed] the language" of the Act without offering any basis for their conclusions, and thus ran afoul of the principles set forth in *Murray*. (Internal quotation marks omitted.) *Moody*, 2020 IL App (1st) 190565, ¶¶ 54, 47. *Moody* distinguished *Murray* in that the expert witnesses in respondent's SVP case testified extensively as to the respondent's behavior that ultimately led to their diagnoses and thus found such expert witness testimony to be sufficient under the Act. *Id.* ¶ 53. We fail to see any inconsistencies between *Moody* and *Murray* with regard to the question of the sufficiency of expert testimony, as both reiterate the requirement to strictly adhere to the applicable rules of evidence in light of the State's specific burden.[8] Accordingly, as with the *Moody* court's analysis on sufficiency as it relates to mental disorders, we also find no reason to depart from its analysis regarding expert witness testimony.[9] Further, as is apparent from

---

[8]Rule 705 of the Illinois Rules of Evidence (Ill. R. Evid. 705 (eff. Jan. 1, 2011)) governs the disclosure of facts or data relating to expert witness testimony. Rule 705 provides that any testifying expert "may testify in terms of opinion or inference and give reasons *** without first testifying to the underlying facts or data, unless the court requires otherwise." *Id.* Further, the expert may also "be required to disclose the underlying facts or data on cross-examination." *Id.*

[9]We further remind the parties that the "opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels." *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008). Thus, while the State argues that Montilla had failed to provide "compelling reasons" or "good cause" to depart from *Moody* pursuant to the doctrine of *stare decisis*, although we find no basis to depart from its reasoning, we are not bound by it.

the discussion above, something more than "canned opinions" were offered by the State's expert witness to support its finding that Montilla was an SVP.

¶ 115   In sum, we find neither of Montilla's sufficiency arguments persuasive and therefore reject both. That said, we proceed with our analysis of Montilla's challenge to the court's finding of substantial probability to reoffend.

¶ 116                                   ii. Substantial Probability to Reoffend

¶ 117   Montilla argues that the State failed to prove that he was dangerous, meaning that his mental disorder made him substantially probable to engage in acts of violence. In particular, Montilla takes issue with Dr. Suire's testimony considering "idiosyncratic factors" that were, according to Montilla, not grounded in any research. Montilla also points out that Dr. Suire omitted key statistics in his report, such as absolute risk factors and rates of reoffending against family members. Last, Montilla characterizes Dr. Suire's testimony as "biased" based on a line of testimony concerning Montilla's "monitoring" of an underaged girl while at the technical college.

¶ 118   The State responds that Dr. Suire's testimony was sufficient to establish substantial probability. The State points out that Dr. Suire's opinion was derived from a comprehensive risk assessment, which on its own found Montilla to be above average on a risk to reoffend, as well as consideration of idiosyncratic, dynamic, and protective factors. The State further characterizes Montilla's disagreement with Dr. Suire's conclusions as a thinly-veiled attempt to request this court to improperly reweigh evidence.

¶ 119   Courts have found expert witness testimony to be sufficient when "the experts' testimony sufficiently linked the respondent's likelihood to reoffend to his diagnoses." *Id.* ¶ 64. Although the State only presented one expert against the three who concluded that Montilla was not substantially probable to reoffend, we reiterate that the trier of fact is in the best position to weight the expert's

testimony and assess their credibility. *Adams*, 2021 IL App (1st) 182049, ¶ 61. Further, it is not this court's job to retry Montilla and substitute our judgment with that of the trial court. *Gavin*, 2019 IL App (1st) 180881, ¶ 49.

¶ 120   The record shows that the trial court found the State's expert to be more persuasive because Dr. Suire's testimony sufficiently linked the respondent's likelihood to reoffend to his mental disorder. Dr. Suire's testimony was that, to a reasonable degree of psychological certainty, Montilla was substantially probable to reoffend based on a variety of factors, namely his pedophilic disorder, failure to complete sex offender treatment, and the high-risk situations in which he placed himself while on parole. Dr. Suire's testimony was grounded not only in statistical analysis but also, as urged by the developers of the Static instruments, dynamic and idiosyncratic factors to provide a holistic evaluation of the individual. See *Montanez*, 2020 IL App (1st) 182239, ¶ 76 ("We do not require any specific, precise, or exact testimony to find that an expert sufficiently made the connection between the respondent's mental condition and risk of reoffense."); see also *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 26 (affirming finding of substantial probability where expert witnesses relied not just on actuarial tests, but respondent's criminal history and underlying behaviors). We also find significant that one of Montilla's own witnesses, Dr. Leavitt, while on the one hand opining that Montilla was *not* substantially probable to reoffend, nevertheless contradictorily testified that Montilla's sexual interest in children had likely not been resolved in any way, and that while out on parole, he had been "deep in his reoffending cycle" and that an offense against the underaged girl at the technical college was "almost imminent." See *Moody*, 2020 IL App (1st) 190565, ¶ 62 ("substantially probable" has been interpreted to mean "much more likely than not that the respondent will commit acts of *** violence as a result of his

mental disorder" (internal quotation marks omitted)); see also *Haugen*, 2017 IL App (1st) 160649, ¶ 24; *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000)).

¶ 121    The trial court discounted the testimony of the remaining expert witnesses because they had failed to consider Montilla's time while on parole and that, at the time of trial, he had not been around potential victims for at least 15 years. See *Gavin*, 2019 IL App (1st) 180881, ¶ 38 ("[T]he State can satisfy its burden on an SVP petition even in the complete absence of 'sexually overt acts in the controlled environment of a prison.' " (quoting *White*, 2016 IL App (1st) 151187, ¶ 60)); see also *In re Detention of Lieberman*, 379 Ill. App. 3d 585, 602 (2007) (sufficient evidence that respondent was an SVP even after no evidence of nonconsensual sexual activity in 26 years); *Evans*, 2021 IL App (1st) 192293, ¶ 53 ("Courts have consistently upheld SVP findings despite the absence of sexually offensive activity while in the controlled environments of prison or the TDF."). Indeed, as noted by all the experts, the factors assessed in the Static-99 and Static-2002 do not account for high-risk situations outside of formal charges and convictions. Although Montilla did not commit an act of sexual violence in at least 15 years, at least two experts opined that Montilla had been "deeply" within his reoffending cycle while out on parole and was contemplating committing another offense, an event for which the trial court expressed serious concern. Thus, on balance, the trial court properly took into consideration the submitted "psychological testing, the record, police reports, evaluations, and interviews with respondent" to reach its conclusion that Montilla was substantially probable to reoffend. We find no reason to disturb the trial court's determination on this element of the Act.

¶ 122                                         III. CONCLUSION

¶ 123    In sum, we find that the State sufficiently met its burden, beyond a reasonable doubt, that Montilla suffered from a mental disorder and the existence of that disorder made it substantially

probable that he would engage in acts of sexual violence. Accordingly, we affirm the trial court's judgment in its entirety.

¶ 124   For the reasons stated, we affirm the judgment of the trial court.

¶ 125   Affirmed.

*In re Commitment of Montilla*, 2022 IL App (1st) 200913

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 06-CR-80004; the Hon. Michael Clancy, Judge, presiding. |
| **Attorneys for Appellant:** | Michael R. Johnson, Kate E. Levine, and Ian C. Barnes, of Johnson & Levine LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick, Evan B. Elsner, and Joshua M. Schneider, Assistant Attorneys General, of counsel), for the People. |